FILED
United States Court of Appeals
Tenth Circuit

June 9, 2010

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

TRAVIS DUVALL,

        Plaintiff-Appellant,

v.

GEORGIA-PACIFIC CONSUMER
PRODUCTS, L.P., a foreign limited
partnership, f/k/a Georgia-Pacific
Corporation,

        Defendant-Appellee.

No. 08-7096

**Appeal from the United States District Court
for the Eastern District of Oklahoma
(D.C. No. 07-CV-00315)**

Jonathan E. Shook of Shook & Johnson, P.L.L.C., Tulsa, Oklahoma, for Plaintiff-Appellant.

Sabrina Presnell Rockoff (Randall D. Avram, with her on the brief) of Kilpatrick Stockton, LLP, Raleigh, North Carolina (Thomas D. Robertson of Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C., Tulsa, Oklahoma, with her on the brief), for Defendant-Appellee.

Before **MURPHY, EBEL,** and **HARTZ,** Circuit Judges.

**EBEL**, Circuit Judge.

In this appeal, we are asked to decide when a position is "vacant" for the purposes of the Americans with Disabilities Act ("ADA"), such that a disabled employee may request reassignment to that position as a reasonable accommodation. Plaintiff-Appellant Travis Duvall, who suffers from cystic fybrosis, worked in the shipping department of a paper mill owned by Georgia Pacific ("GP"). When GP decided to begin outsourcing the running of its shipping department, Duvall transferred to another department but found that the paper dust in the air made it impossible for him to work there. As a reasonable accommodation, Duvall requested that he be put back in his old shipping position, which was then occupied by a temporary contract worker pending the permanent outsourcing of the department, or in a position in the mill's storeroom, which was also in flux at the time with a number of temporary employees filling some of the storeroom positions. GP refused these requests, and Duvall sued under the ADA. The district court granted summary judgment in favor of GP, holding that the shipping department and storeroom positions filled by temporary workers were not "vacant" within the meaning of the statute. Exercising jurisdiction under 28 U.S.C. § 1291, we AFFIRM that judgment.

## Background

When Travis Duvall began working at GP's Muskogee Paper Mill, he informed the mill management that he suffered from cystic fibrosis. For the 7 1/2 years before the events giving rise to this litigation, Duvall worked in the shipping department of the mill, which received finished and packaged paper products from other departments and prepared them for shipping. By 2006, Duvall was earning around $19.50 per hour in the

shipping department. In December of 2005, GP determined that it would outsource all shipping operations to a company called Network Logistics Solutions ("NLS"), which would then operate shipping as a separate company within the mill. The changeover from GP to NLS staffing of the shipping department was originally scheduled to be complete by the end of June 2006. Once the transition was complete, the only GP jobs remaining in the shipping department would be palletizer positions—positions that required the use of GP equipment.

As part of the transition, GP employees in the shipping department were given the opportunity to bid for jobs in other parts of the plant, particularly in the converting department, which was a growth area in need of extra staff. As GP employees transferred out of shipping or left the company, they would be replaced by temporary workers provided by a third-party temporary staffing company called Encadria. The Encadria employees would remain in the positions until the NLS staff were ready to take over the department. GP elected to conduct the transition in this manner in order to minimize the impact on its full-time employees and avoid having to reassign or lay off all the shipping personnel at once.

There is little information in the record characterizing the relationship between GP and Encadria. There is an email from the "Senior Client Service Supervisor" at Encadria to GP's human resources department listing the positions at the mill for which Encadria provided staff; both the storeroom and the shipping department were included in that list of positions. (See Apl't App. at 135.) In his deposition, GP's mill manager, Karl

Meyers, indicated that sometimes Encadria temporary employees were hired by GP permanently to fill the positions they occupied, but that "they would have to apply as any other person would have applied for the job," and would be hired only if they met the prerequisites of the position. (Id. at 213.) Finally, Meyers characterized GP's stance toward Encadria temporary workers by observing, somewhat vaguely, "Encadria filled positions that were open that we had." (Id. at 214.) Unfortunately, Meyers' deposition is presented in the record in isolated snippets, and his testimony is difficult to place in any broader context.

As the outsourcing of the shipping department progressed, the palletizer positions that would remain open to GP employees in shipping became very popular; Duvall did not possess the seniority required to successfully bid into one of these positions. By February 2006, the only positions open to Duvall based on his seniority were in the converting department. In converting, raw rolls of newly-fabricated paper were machined into finished product, such as napkins. As a result, the air in the converting department bore a significant amount of paper dust. Duvall bid for and secured a position as a J-Line Operator; in this position he removed newly-fabricated napkins from a machine by hand. After being certified on the machine, Duvall's rate of pay was increased to $21.00 per hour, which was commensurate with the pay rates in converting. According to standard mill policy, an employee transferring between departments was paid at the rate of their new department, without regard to their prior wage.

But the dusty environment in converting took a toll on Duvall's health. By April 2006, he was experiencing severe breathing difficulty. He could not wear the dust mask provided him by GP; while it filtered out much of the dust, it also restricted the air he could inhale. On April 24, at the beginning of his shift, he went to the mill nurse to complain about his problems; she sent him to Muskogee Immediate Care, where he was advised to see his pulmonologist, and to avoid exposure to paper dust. The mill nurse then convened a Company Response Team ("CRT") consisting of herself, the plant's safety manager, and other mill personnel, with the goal of remedying Duvall's situation. The CRT gave Duvall an essential functions form for his J-Line Operator position for his pulmonologist to fill out, and allowed him to work the remaining two days in his shift week back in shipping, since he had not been symptomatic there. During these two days, Duvall observed that the shipping department was staffed with around 20 Encadria employees and 14 GP employees.

In early May of 2006, Duvall returned to the CRT with the essential functions form filled out by his pulmonologist. While the form itself is not in the record, a member of GP's human resources staff made contemporaneous notes indicating that the form contained a permanent restriction—"cannot work with paper dust in air." (Apl't App. at 119.) The CRT told Duvall that, due to the nature of the work performed at the mill, no area would meet that restriction. Duvall rejoined that he had worked for years in shipping without difficulty, but the CRT responded that there were no open GP jobs in shipping, other than the palletizer positions that Duvall did not have the seniority to

obtain. Duvall was given the paperwork for filing a short-term disability claim; this insurance eventually paid a portion of his salary while he was out of work.

But there was one area of the mill other than shipping where Duvall could safely work: the storeroom. Air quality tests there eventually revealed dust levels far below those in converting, and on par with the levels in the shipping department. Duvall was not offered a position in the storeroom in May of 2006, however, because at that time GP's plans for staffing the storeroom were "in a state of flux." (Apl't App. at 210.) During the spring and summer of 2006, GP was considering plans to outsource the storeroom as well as the shipping department, but by July of 2006, it had decided that the storeroom would be staffed entirely by GP employees.[1] The GP employees who were already working in the storeroom would maintain their current rate of pay, but new hires and transfers into the department would be paid between $11.00 and $17.00 per hour.

---

[1] Duvall insists that this was not the case, and that GP could have reassigned Duvall—even temporarily—to the storeroom as of April 2006. In support of this assertion, he offers the testimony of Ronnie Gilliam, the mill's maintenance superintendant. Gilliam testified that he frequently found places in the storeroom for mill employees temporarily unable to work elsewhere; that he was never asked to do so for Duvall; and that he was never aware of a state of flux regarding storeroom staffing. This testimony, however, fails to create a genuine issue of material fact. That Gilliam was not aware of a "staffing flux" in the storeroom does not show that such a flux did not exist; indeed, the events in question took place during the final year before he retired from the mill, and he admitted in his deposition that staffing discussions could have occurred that he was not aware of. (Apl't. App. at 279.) And the record amply supports the existence of such discussions during the relevant time period. (Id. at 280-89 ("Muskogee Storeroom Wage Rates Proposal, 7-28-06").)

On July 31, 2006, the CRT offered Duvall two positions. First was a "Palletizer Temporary Position," in which he would fill in for the full-time palletizers in shipping when they went on vacation or the department was otherwise short-staffed. This position would not offer regular shifts or predictable hours. The second position was a storeroom clerk, at a pay rate of $17.00 per hour—the top end of the new storeroom pay scale, but less than the $21.00 Duvall had been making in converting. Notwithstanding the reduction in pay, Duvall accepted the storeroom position and returned to work the first week of August, 2006.

On December 27, 2006, Duvall filed suit against GP in the Eastern District of Oklahoma, alleging that GP violated the ADA by failing to reasonably accommodate his disability. GP moved for summary judgment on August 1, 2008, and the district court granted that motion on September 17. Duvall timely appealed to this court.

**Discussion**

**I.    Standard of Review**

The district court granted GP's motion for summary judgment; we review that determination de novo, applying the same standard as the district court. See Hennagir v. Utah Dept. of Corr., 587 F.3d 1255, 1261 (10th Cir. 2009). We must affirm if the record reveals no genuine issue of material fact and if the moving party—here GP—is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c)(2). Finally, in applying Rule 56, "we

consider the evidence in the light most favorable to the non-moving party." Bowling v. Rector, 584 F.3d 956, 964 (10th Cir. 2009).

## II.     The ADA Reassignment Duty and the Meaning of "Vacant"

The Americans with Disabilities Act commands that no employer "discriminate against a qualified individual on the basis of disability in regard . . . terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  A "qualified individual" is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).  Within its definition of "discriminate," the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability."  42 U.S.C. § 12112(b)(5)(A).  Finally, the Act states that such a "reasonable accommodation" may include "reassignment to a vacant position."  42 U.S.C. § 12111(9)(B).

The parties do not dispute that Duvall's cystic fibrosis renders him disabled within the meaning of the statute.  (See Apl't App. at 392-93.)  Therefore, resolution of this case turns on whether the ADA required GP to reassign Duvall either to his old position in the shipping department until it was ready to be permanently outsourced to NLS, or to a position in the storeroom during the three months of the summer of 2006 in which he was unable to work in the converting department and was not offered a position in the storeroom.  To answer that question, we first consider the scope of the duty of

reassignment imposed by the ADA in this circuit, then define the term "vacant" in the

statute, and finally apply that definition to Duvall's circumstances.

A.     **ADA Reassignment in the Tenth Circuit**

This court's most thorough exploration of the ADA reassignment duty was in

Smith v. Midland Brake, Inc., 180 F.3d 1154 (10th Cir. 1999) (en banc).  In that case, we

determined that the statutory duty upon employers to reassign disabled employees to

vacant positions is mandatory.  If a disabled employee can be accommodated by

reassignment to a vacant position, the employer must do more than consider the disabled

employee alongside other applicants; the employer must offer the employee the vacant

position.  Id. at 1167.

Midland Brake sets out the elements of a claimed ADA violation based on a

failure to reassign a disabled employee:

> (1) The employee is a disabled person within the meaning of the
>     ADA and has made any resulting limitations from his or her
>     disability known to the employer;
> (2) The preferred option of accommodation within the
>     employee's existing job cannot reasonably be
>     accomplishe[d;]
> (3) The employee requested the employer reasonably to
>     accommodate his or her disability by reassignment to a vacant
>     position, which the employee may identify at the outset or
>     which the employee may request the employer identify
>     through an interactive process, in which the employee in good
>     faith was willing to, or did, cooperate;
> (4) The employee was qualified, with or without reasonable
>     accommodation, to perform one or more appropriate vacant
>     jobs within the company that the employee must, at the time
>     of the summary judgment proceeding, specifically identify

- 9 -

and show were available within the company at or about the time the request for reassignment was made; and

(5) The employee suffered injury because the employer did not offer to reassign the employee to any appropriate vacant position.

Id. at 1179.

The employer's obligation to reassign a disabled employee is not, however, without limit. In Midland Brake, we recognized the overarching principle that all accommodations under the ADA must be governed by the statutory modifier of reasonableness. Id. at 1171. In addition to that blanket principle, we noted a number of specific situations in which reassignment would be unreasonable. Four of these situations are potentially relevant to this case. First, "[i]t is not reasonable to require an employer to create a new job for the purpose of reassigning an employee to that job." Id. at 1174. Next, the ADA does not require the employer to reassign a disabled employee to a position that would constitute a promotion. Id. at 1176 ("[The ADA] is not a statute giving rise to a right to advancement."). Third, the ADA does not require an employer to reassign a disabled employee in a manner that would contravene that employer's "important fundamental policies underlying legitimate business interests." Id. at 1175. Finally, and most importantly for the purposes of this appeal, the job to which a disabled employee seeks reassignment must, as the statute's text dictates, be vacant. Id. "[I]f a position is not vacant it is not reasonable to require an employer to bump another employee in order to reassign a disabled employee to that position." Id. (citing H.R. Rep. No. 101-485(II), at 63 (1990), reprinted in 1990 U.S.C.C.A.N. 303, 345

- 10 -

("[R]eassignment need only be to a vacant position – 'bumping' another employee out of a position to create a vacancy is not required.")).

## B. The Meaning of "Vacant"

The operative question in this case, therefore, is: did GP have any vacant positions to which Duvall could have been reassigned during the relevant three-month period between May and August of 2006? It is uncontested that some jobs in both the shipping department and the storeroom during that period were being filled by temporary workers provided by Encadria. In the case of shipping, those temporary workers were filling in until NLS employees could permanently take over the department; in the storeroom, the Encadria temps were working pending GP's storeroom restructuring plans, which were completed in late July 2006. According to GP, positions filled by Encadria temporary workers were not "vacant" within the meaning of the statute; Duvall maintains, to the contrary, that if a GP position was filled by an Encadria temp, then that position was—as far as GP was concerned—vacant. To decide which of these interpretations is correct, we must engage in statutory interpretation to determine the meaning of the term vacant.

We have not previously defined the term "vacant" for the purposes of the ADA, and we have not found any cases from our sister circuits doing so.[2] Nor has the Supreme

---

[2] The Equal Employment Opportunity Commission ("EEOC") has defined the term as follows: "'Vacant' means that the position is available when the employee asks for reasonable accommodation, or that the employer knows that it will become available within a reasonable amount of time." Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act

Continued . . .

- 11 -

Court defined the term, but in US Airways, Inc. v. Barnett, 535 U.S. 391, 399 (2002), the Court observed that "[n]othing in the [ADA] suggests that Congress intended the word 'vacant' to have a specialized meaning." We therefore begin our analysis by considering the ordinary meaning of "vacant." See Conrad v. Phone Directories Co., 585 F.3d 1376, 1381 (10th Cir. 2009) (noting that we begin statutory analysis by considering the ordinary meaning of statutory terms, and we may consult dictionaries to determine that meaning).

Webster's Dictionary offers two relevant definitions of vacant: "not filled or occupied by an incumbent [or] possessor" and "being without . . . occupant." Webster's Third New International Dictionary 2527 (1986 ed.); accord Barnett, 535 U.S. at 409 (O'Connor, J., concurring) (quoting Webster's definition). These definitions, however, fail to provide for all the nuances of the employment relationship. To arrive at a proper meaning for the term vacant, we must consider it in the context of the statute as a whole—in this case, as a regulation of the employment relationship. See Conrad, 585 F.3d at 1381 ("We . . . take into account the broader context of the statute as a whole when ascertaining the meaning of a particular provision.") (quotation omitted). In the employment context, we hold that a position is "vacant" with respect to a disabled

("EEOC Guidance"), at 21 (2002). As the agency tasked with enforcing the ADA, we accord the views of the EEOC substantial deference. See Midland Brake, 180 F.3d at 1165 n.5. However, the definition in the EEOC Guidance is too broad to answer the question presented here—asking whether a position filled by a temporary employee is "available" is no different for the purposes of this case from asking whether it is "vacant."

employee for the purposes of the ADA if it would be available for a similarly-situated non-disabled employee to apply for and obtain.[3]

This definition best serves the non-discriminatory aims of the ADA. Congress' purpose in passing the statute was to place disabled employees on an equal footing with their non-disabled coworkers. See Kornblau v. Dade County, 86 F.3d 193, 194 (11th Cir. 1996) ("The purpose of the [ADA] is to place those with disabilities on an equal footing, not to give them an unfair advantage."). This is reflected at the very core of the statute, in the definition of a "qualified individual." That category is limited to those disabled employees "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8) (emphasis added). To be covered under the statute, the disabled employee must be capable of performing the essential core of the job at issue. Jarvis v. Potter, 500 F.3d 1113, 1121 (10th Cir. 2007) ("[O]ne who cannot perform the essential functions of

---

[3] We recognize that the ADA may sometimes require an employer to abrogate policies that apply to all employees equally in order to accommodate a disabled employee, under the rubric of reasonableness. Thus, in Midland Brake, we noted that an employer who maintained a blanket no-transfer policy that applied to all employees equally would still be required to reassign a disabled employee to a vacant position as a reasonable accommodation under the ADA. 180 F.3d at 1176. The EEOC concurs. EEOC Guidance at 22 ("[I]f an employer has a policy prohibiting transfers, it would have to modify that policy in order to reassign an employee with a disability, unless it could show undue hardship."). That issue, however, is not presented in this case. In this case, at the time Duvall sought reassignment, the storeroom and shipping positions were in the process of being removed from GP staffing, or being considered for such removal. Duvall does not allege that the outsourcing or consideration of such outsourcing itself was unreasonable. Here, the jobs were not vacant.

the job, even with a reasonable accommodation, is not an 'otherwise qualified' individual."). And employers are not required to modify the essential functions of a position in order to accommodate a disabled employee. Midland Brake, 180 F.3d at 1178 ("Although some 'job restructuring' may be required, if the job restructuring goes to the modification of essential job requirements and is substantial, it is not required.") (citation omitted); see also 29 C.F.R. pt. 1630 App. § 1630.2(o) ("An employer . . . is not required to reallocate essential functions.").

If the term vacant meant anything other than "available to a similarly-situated non-disabled employee," we would run the risk of transforming the ADA from an antidiscrimination statute into a mandatory preference statute. Cf. Dalton v. Subaru-Isuzu Automotive, Inc., 141 F.3d 667, 679 (7th Cir. 1998) (noting that requiring an employer to reassign a disabled employee in a manner that contravened a legitimate, non-discriminatory policy "would convert a nondiscrimination statute into a mandatory preference statute, a result which would be both inconsistent with the nondiscriminatory aims of the ADA and an unreasonable imposition on the employers and coworkers of disabled employees"). And such a result would effectively require employers to create new positions specifically for disabled employees—positions not available to nondisabled employees. Courts have universally held that the ADA does not require this. See Midland Brake, 180 F.3d at 1174 (collecting cases).

In sum, when a disabled employee seeks the reasonable accommodation of reassignment to a vacant position, positions within the company are "vacant" for the

- 14 -

purposes of the ADA when they would be available to similarly-situated nondisabled employees to apply for and obtain.

### C. Application to Duvall

Having defined the term "vacant" in the statute, we may now apply that definition to Duvall to determine whether summary judgment in favor of GP was appropriate. While Midland Brake recognized that a vacant position may come to light as part of the interactive process between the disabled employee and the employer, we have subsequently clarified that, at the summary judgment stage, the plaintiff-employee bears the burden of specifically identifying a vacant position, reassignment to which would serve as a reasonable accommodation. Taylor v. Pepsi-Cola Co., 196 F.3d 1106, 1110 (10th Cir. 1999) ("To survive summary judgment, Plaintiff must establish that he was qualified to perform an appropriate vacant job which he must specifically identify and show was available within the company at or about the time he requested reassignment."); accord McBride v. BIC Consumer Prods Mfg. Co., 583 F.3d 92, 97 (2d Cir. 2009); Shapiro v. Township of Lakewood, 292 F.3d 356, 360 & n.1 (3d Cir. 2002); Phelps v. Optima Health, Inc., 251 F.3d 21, 27 (1st Cir. 2001); Ozlowski v. Henderson, 237 F.3d 837, 840 (7th Cir. 2001).

A review of the record in this case reveals that Duvall has failed to carry that burden. To establish that the Encadria-filled positions at the mill were, in fact, vacant GP positions, Duvall relies entirely upon Karl Meyers' deposition testimony that "Encadria filled positions that were open that we had." (Apl't App. at 214.) Thus, according to

Duvall, since Encadria temporary workers filled positions in both the storeroom and the shipping department during the three months he was out of work, GP should have reassigned him to one of those "open" positions. But even drawing every reasonable inference from Meyers' testimony in Duvall's favor—which we are required to do on review of a grant of summary judgment[4]—that testimony fails to answer what we have identified as the operative question. Even if those positions were "open positions that [GP] had," that does not answer whether the positions were vacant, such that other, nondisabled GP employees would have been able to apply for and obtain them. The undisputed evidence was that GP's business plan was to occupy these positions exclusively with Encadria contract employees until they would permanently be filled with NLS employees or until GP later determined to make the storeroom positions vacant again for its own employees. Thus, from the perspective of GP's employees, the positions were not vacant and available to any of them at the time Duvall sought an accommodating assignment into one of those positions. And because Duvall's evidence fails to create a genuine issue of material fact on that question, we must affirm the district court.

---

[4] We feel that this is the most generous possible reading of an isolated and out-of-context snippet of Meyers' testimony. We treat it thus generously purely as a matter of our standard of review. See Bowling, 584 F.3d at 964. Because Duvall did not provide us with the entire deposition testimony of Meyers, it is impossible for us to determine what Meyers meant when he used the word "open."

Indeed, even though we view Meyers' testimony in the light most favorable to Duvall, the additional, uncontroverted evidence of GP's outsourcing plans would prohibit us from going so far down the road of inference as to find that the Encadria-filled positions were vacant. Duvall has not rebutted GP's evidence that it planned to outsource all but the palletizer positions in shipping to NLS; nor has he rebutted the documentary evidence establishing that staffing in the storeroom at the time in question was in flux. Duvall has not pointed to a single GP employee who was given an Encadria-filled position in either of these departments during the time in question.[5] Therefore, Duvall failed to carry his burden to establish the existence of a vacant position to which he could have been reassigned, and summary judgment was appropriate.

## Conclusion

We hold that a position is "vacant" for the purposes of the ADA's reassignment duty when that position would have been available for similarly-situated nondisabled employees to apply for and obtain. Because Duvall failed to establish a genuine issue of material fact regarding that question, we AFFIRM the district court's grant of summary judgment for the defendant.

---

[5] We note that the CRT elected to allow Duvall to work two days in shipping after he began complaining of the adverse symptoms he developed in converting at the end of April 2006. Duvall does not argue that this two-day assignment establishes that the shipping positions were vacant at the time, and the record establishes that this brief reassignment was purely an interim, stop-gap measure designed to allow Duvall to finish his shift-week while the CRT attempted to devise a reasonable accommodation for his disability.