**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 12, 2013**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

APRIL LAYTON, as personal
representative of the Estate of Charles
Holdstock, deceased; APRIL
LAYTON, individually; VALERIE
WINFREY, individually; MELANIE
HUFNAGEL, individually,

      Plaintiffs-Appellants,

v.

THE BOARD OF COUNTY
COMMISSIONERS OF OKLAHOMA
COUNTY, a political subdivision of
the State of Oklahoma; JOHN
WHETSEL, in his capacity as Sheriff
of Oklahoma County,

      Defendants-Appellees.

No. 11-6223
(D.C. No. 5:09-CV-01208-C)
(W.D. Okla.)

**ORDER AND JUDGMENT**[*]

Before **KELLY**, **EBEL**, and **HOLMES**, Circuit Judges.

Charles Holdstock died while being held as a pretrial detainee in Oklahoma

County jail. Mr. Holdstock's daughters—April Layton, individually and as the

---

[*] This order and judgment is not binding precedent except under the
doctrines of law of the case, res judicata and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Federal Rule of Appellate
Procedure 32.1 and Tenth Circuit Rule 32.1.

representative of Mr. Holdstock's estate, Valerie Winfrey, and Melanie Hufnagel (together "Appellants")—filed a suit against John Whetsel, Sheriff of Oklahoma County, in his official and individual capacities; the Board of County Commissioners of Oklahoma County (the "County"); and Correctional Healthcare Management of Oklahoma ("CHMO"), the contractor that provided primary medical services to Mr. Holdstock during his detention. Appellants alleged violations of Mr. Holdstock's rights under the Eighth and Fourteenth Amendments pursuant to 42 U.S.C. § 1983, and violations of Oklahoma law. The district court granted summary judgment in favor of Sheriff Whetsel and the County. Appellants filed a timely appeal.[1] They challenge the district court's grant of summary judgment to Sheriff Whetsel only with regard to his official capacity and also the court's summary judgment ruling for the County.

We **REVERSE** in part and **VACATE** in part the district court's grant of summary judgment. Because a reasonable jury could find that Sheriff Whetsel and the County acted with deliberate indifference, we **REVERSE** the district court's summary judgment ruling on Appellants' § 1983 claims. We **VACATE** the grant of summary judgment on Appellants' state-law claims and **REMAND** for further proceedings.

---

[1]     In the order from which Appellants appeal, the district court denied CHMO's motion for summary judgment. Appellants and CHMO have since settled.

# I

## A

The basic facts regarding Mr. Holdstock's medical treatment while in jail are undisputed. Mr. Holdstock was booked into the Oklahoma County jail on September 5, 2006. He suffered from pre-existing medical conditions, including congestive heart failure, diabetes, and hypertension. He had a pacemaker, and part of his treatment regimen included taking the medication Digoxin. Digoxin is filtered through the kidneys, and, if the kidneys are not functioning properly, Digoxin can build up to toxic levels in the body.

On November 25, 2008, jail staff called the University of Oklahoma Medical Center because a cardiologist who had seen Mr. Holdstock in the Oklahoma Medical Center Emergency Room believed that his pacemaker needed to be replaced. The University of Oklahoma Medical Center checked Mr. Holdstock's pacemaker on December 10, 2008, and it was pacing 100% of the time. The Medical Center noted that Mr. Holdstock was to receive follow-up treatment every twelve weeks. There is no evidence in the record that Mr. Holdstock ever received any follow-up treatment or testing related to his pacemaker.

On April 28, 2009, Mr. Holdstock was found unresponsive on the floor of his cell. His skin was cool and clammy. He was taken to the infirmary run by CHMO, where he was evaluated and treated. The treating physician issued an

"[o]rder to continue to monitor [Mr. Holdstock and] call if [his] condition worsen[ed]." Aplts. App., Vol. I, at 145 (R. of Corr. Healthcare Mgmt., dated Apr. 28, 2009). The next day, Mr. Holdstock was found in his cell, having difficulty breathing and unable to verbalize what was wrong. He was again taken to the infirmary, where the staff performed tests and drew blood for analysis. When his condition stabilized, he was returned to his cell.

Two days later, CHMO received the blood-analysis results from the lab. The lab work indicated that Mr. Holdstock's white blood cell count, neutrophils, glucose serum, BUN count, creatine serum, and potassium serum were all in the high range. Appellants' medical expert testified that the test results "indicate[d] that acid was piling up in his blood; that his kidney failure had gone from a chronic, stable state to . . . a downward spiral." *Id.* at 122 (Dep. of Ralph Lazzara, taken May 9, 2011). Based upon the test results, Appellants' expert "would [have been] very concerned that the digoxin level was toxic," which would have prompted him to check Mr. Holdstock's digoxin level, conduct further testing on his kidneys, and consider hospitalization. *Id.* at 122–23.

However, CHMO took no action following receipt of Mr. Holdstock's test results. No further intervention occurred until May 15—the day of Mr. Holdstock's death—when he was found unresponsive in his cell and sent to the emergency room. Appellants' expert testified that Mr. Holdstock's death could have been prevented had Mr. Holdstock been treated for kidney failure, and that

-4-

there was a reasonable probability that the kidney failure resulted from Mr. Holdstock's pacemaker failing, which could have been prevented had the pacemaker been checked.

**B**

Appellants allege that Sheriff Whetsel and the County were aware of grave deficiencies in the medical care provided to detainees, and that the problems were systemic and long-standing. They point to several documents—all of which involve matters preceding Mr. Holdstock's death—that evince deficiencies in the medical care that the jail furnished to prisoners. In particular, they identify a report that the U.S. Department of Justice ("DOJ") issued on July 31, 2008, and seven "Reports on Death Investigations" and two "Reports on Complaint Investigations" prepared by the Oklahoma State Department of Health ("OSDH"). In addition, they draw attention to the OSDH's report concerning Mr. Holdstock's death. Appellants aver that Sheriff Whetsel and the County were "aware that patients were not being seen in a timely manner" and that there were ongoing problems both with the administration of prescription medications and in providing follow-up care to seriously ill patients. Aplts. Opening Br. at 12.

At bottom, Appellants contend that Sheriff Whetsel and the County are liable under § 1983 for failing to adequately monitor Mr. Holdstock and for not providing him with prescribed, and constitutionally-mandated medical care. In this regard, they contend that (1) Mr. Holdstock was not monitored despite the

doctor's directive that he be monitored; (2) by virtue of the jail's design, Mr. Holdstock *could not have been* adequately monitored once returned to his cell; and (3) the Sheriff and the County had actual knowledge that the deficiencies in medical care for seriously ill detainees like Mr. Holdstock were serious enough to amount to constitutional violations.

The DOJ Report—the product of four separate inspections of the jail—concluded that "certain conditions at the Jail violate the constitutional rights of detainees confined there." Aplt. App., Vol. I, at 155 (DOJ Investigation of the Okla. Cnty. Jail, dated July 31, 2008). The report stated that four years had passed between the DOJ's first three tours of the jail and its most recent one, but "[d]espite this opportunity to improve conditions at the Jail, . . . [the DOJ] did not observe improved conditions." *Id.* at 154.

More specifically, the DOJ report stated that "actual direct supervision of detainees at the Jail is virtually non-existent [and the] facility is not adequately staffed to maintain necessary supervision of detainees to secure their safety." *Id.* at 157. It further found that: (1) conditions at the jail make it "difficult, if not impossible, for detention staff to be able to provide adequate safety and security checks of the detainees," *id.* at 158; (2) the crowded conditions "tax numerous areas of Jail operations and create circumstances that contribute to unconstitutional conditions," *id.* at 157 n.4; (3) "detention officers have little time to actually monitor detainees [and] detainees are often left unsupervised for

-6-

extended periods of time," *id.* at 158; (4) while surveillance cameras have been installed in many areas of the jail, "blind spots exist within the housing units, such as in . . . the inside of the cells, which cannot be monitored with cameras," *id.*; and (5) "[c]ompounding the lack of adequate detainee supervision within the housing units is limited visibility into the individual cells," *id.*

During the DOJ's tours of the jail, they "uncovered instances where detainees were not provided access to medical care, specifically acute services—with dire results." *Id.* at 166. While the jail has a "sick call system for detainees to access *routine* medical care services, detainees' serious medical needs are not adequately met." *Id.* (emphasis added). Again noting problems with non-routine care, the report included the finding that the jail "has had some problems providing appropriate access to medical care during emergencies." *Id.* at 167. The report described an incident where the medical care that the jail furnished to a detainee was, in the DOJ's opinion, "'unconscionable' during the hours she was in critical need of access to medical care." *Id.*

The report outlined several recommended remedial measures, which, in the DOJ's view, should "at a minimum" be implemented "to address the constitutional deficiencies identified . . . and protect the constitutional rights of detainees." *Id.* at 173. Among these, the DOJ recommended that the jail "implement policies and procedures to allow adequate supervision of detainees. This should include[] conducting adequate staff rounds . . . and promptly

-7-

responding to medical or other emergencies." *Id.* Within a general admonishment to "ensure the timely assessment, identification and treatment of detainees' medical . . . needs," the report outlined a need to "[p]rovide timely and appropriate treatment for detainees with serious medical . . . conditions," and provided that "detainees with chronic diseases [should] receive screening, testing, treatment, and continuity of care," and that the jail should "[p]rovide medications . . . in a timely manner." *Id.* at 174. Further, according to the DOJ, the jail should "[p]rovide medical and mental health staffing sufficient to meet detainees' serious medical and mental health needs . . . includ[ing] staffing to provide timely . . . medical care." *Id.* at 175.

The OSDH's report on Mr. Holdstock's death also tends to bolster the Appellants' contention that Mr. Holdstock was not monitored as directed by his treating physician, as it notes that he was "[n]ot kept in a location where he could be observed." *Id.* at 148 (Okla. Dep't of Health Report on Charles Holdstock's Death, dated May 18, 2009). It further points out a number of other deficiencies in Mr. Holdstock's treatment, including that "[m]edications [were] not given as directed," *id.*—on one day, because his "medication was out of stock," *id.* at 147, and on others, because Mr. Holdstock either was "not in his cell or would not come to the cell door to receive his medications," *id.* Further, on "a few days . . . [Mr.] Holdstock was not getting his medication at all," without there being "any explanation as to why he didn't get his medications" in the Medication

Preparation Record. *Id.*

The OSDH's report on Mr. Holdstock's death was accompanied by a violation notice, explaining that "[s]tate law requires periodic inspections of . . . jails to ensure compliance with the [statutory] Jail Standards," and that a "May 18, 2009 . . . inspection revealed the jail [was] not in compliance with [statutory] standards." *Id.* at 149. Specifically, the violation notice charged that the jail did not meet Oklahoma Jail Standards for five reasons: first, the jail failed to meet the standard for "[a]dequate medical care" because Mr. Holdstock "was not kept in a location where he could be observed," *id.* at 151; second, "administration of medication was not logged," *id.* at 152; third, the standard for provision of medications as directed by a physician was not met because "medications were not given as directed," *id.*; fourth, the "special diets" standard was not met because "according to [Mr.] Holdstock's cellmate, [Mr.] Holdstock was not getting a special diet," *id.* at 150; and finally, the standard for record-keeping was not met because "no blood sugar tests were found for the month of April," *id.*

In addition, viewed in the aggregate, the Death Investigation Reports and Complaint Investigation Reports suggest a pattern of the jail failing to provide medical care that meets Oklahoma statutory requirements, including requirements to consistently dispense medication as required and to monitor detainees with medical problems. These reports, dated between 2007 and 2009, were each issued with violation notices and demands to cure. Among the reports that Appellants

cite, there were a total of seventeen official deficiencies noted. The most common deficiency was failing to properly administer prescription medications. Other deficiencies included failure to keep an inmate in a location where he could be monitored, failure to render aid, failure to administer mandatory sight-checks, administration of prescription medications without physician oversight, and failure to provide appointments with physicians within statutorily-defined maximum wait-times.

Apart from the violation notices included with Death or Complaint Investigation Reports, Appellants note that the OSDH issued notices regarding numerous other violations at the Oklahoma County jail over a several-year period spanning from 2003 to 2007. Frequently, those violations related to the failure to dispense prescription medications as prescribed, and the failure to monitor inmates as required either for safety or medical reasons.[2]

---

[2] At oral argument, the attorney for the County and Sheriff Whetsel represented that none of the violations identified by the OSDH resulted in subsequent sanctions or further action against the jail. *See* Oral Arg. at 16:14–19:51. However, the attorney also admitted that this information was not part of the summary judgment record (nor was it included in the record on appeal). *See id.* We do not consider facts presented for the first time at oral argument. *See Nulf v. Int'l Paper Co.*, 656 F.2d 553, 559 (10th Cir. 1981) ("Matters not appearing in the [district-court] record will not be considered by the court of appeals."); *cf. Gross v. Burggraf Const. Co.*, 53 F.3d 1531, 1547 (10th Cir. 1995) ("Although Gross maintained in oral argument that she was asserting a claim of retaliation under Title VII, she has not adequately briefed this issue on appeal. Therefore, we decline to consider the merits of Gross' claim of retaliation.").

Moreover, the initial report of the Oklahoma County Adult Detention Advisory Committee ("ADAC")—a body created by the County in 2008—notes what the ADAC perceives to be myriad ongoing constitutional violations. The ADAC points to the DOJ's investigation of the jail that began in 2003 and resulted in a "scathing report" dated July 31, 2008. Aplts. App., Vol. II, at 430 (ADAC Initial Report).[3]

The ADAC's twenty-four page report states that "[c]hange must occur" and that the "County has received its warning." *Id.* at 450. It notes that the "County has chosen to take no substantive action" despite several entities—namely, a 1995 grand jury, the Project 9 Jail Committee, the Jail Funding Task Force, and the DOJ—calling for remedies to problems relating to a "continued violation of detainees' Constitutional rights." *Id.* at 437. According to the ADAC report, "it is not a question of whether something is going to be done about the conditions in the Jail, but rather a question of whether something will be done voluntarily and under circumstances in which the County retains some control and some choice, or involuntarily, when ordered by a federal court." *Id.* Among numerous recommendations for improvements was a call for the jail to create an annex including a "real medical clinic," amid statements that "[t]he existing 'clinic' is

---

[3]     The ADAC report is undated and, consequently, it is not entirely clear when the report was issued. However, based upon its contents, it appears to have been issued in late 2008 or early 2009. Significantly, Sheriff Whetsel and the County do not appear to argue that it was issued after Mr. Holdstock's death.

-11-

inadequate," and that there is "[c]ontinued poor care." *Id.* at 443.

According to Appellants, these documents support their contention that Sheriff Whetsel and the County had actual knowledge of ongoing constitutional violations in the provision of medical care to seriously ill detainees, and that their failure to provide constitutionally adequate treatment to Mr. Holdstock caused his death.

## II

## A

"We review summary judgment rulings de novo and apply the same standard as the district court . . . ." *Breaux v. Am. Family Mut. Ins. Co.*, 554 F.3d 854, 858 (10th Cir. 2009). "[S]ummary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Morris v. City of Colo. Springs*, 666 F.3d 654, 660 (10th Cir. 2012) (quoting Fed. R. Civ. P. 56(a)). In reviewing a grant of summary judgment, "we consider the evidence in the light most favorable to the non-moving party." *EEOC v. C.R. Eng., Inc.*, 644 F.3d 1028, 1037 (10th Cir. 2011) (quoting *Duvall v. Ga.-Pac. Consumer Prods., L.P.*, 607 F.3d 1255, 1259 (10th Cir. 2010)) (internal quotation marks omitted).

## B

"We will not hold a municipality liable [for constitutional violations] when there was no underlying constitutional violation by any of its officers." *Olsen v.*

-12-

*Layton Hills Mall*, 312 F.3d 1304, 1317–18 (10th Cir. 2002) (quoting *Hinton v. City of Eldwood*, 997 F.2d 774, 782 (10th Cir. 1993)) (alteration in original) (internal quotation marks omitted). "When an officer deprives a citizen of a constitutional right, however, municipal governments may incur liability under § 1983 when 'the action that is alleged to be unconstitutional implements or executes a policy, statement, ordinance, regulation or decision officially adopted and promulgated by that body's officers." *Id.* at 1318 (quoting *Monell v. Dep't. of Soc. Servs.*, 436 U.S. 658, 690 (1978)). "[I]t is only when the execution of the government's policy or custom . . . inflicts the injury that the municipality may be held liable under § 1983." *Id.* (quoting *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)) (internal quotation marks omitted). Accordingly, for Appellants to hold the County[4] liable under § 1983, they must first demonstrate (1) that an officer deprived Mr. Holdstock of a constitutional right, and (2) that a County policy or custom was the moving force behind the constitutional deprivation. *See City of Canton*, 489 U.S. at 385; *Monell*, 436 U.S. at 694; *Myers*, 151 F.3d at 1318. We turn first to the issue of whether Mr. Holdstock's constitutional rights were violated.

---

[4]     A "suit against [the Sheriff] in his official capacity as sheriff is the equivalent of a suit against [the] County." *Lopez v. LeMaster*, 172 F.3d 756, 762 (10th Cir. 1999); *see also Myers v. Okla. Cnty. Bd. of Cnty. Comm'rs*, 151 F.3d 1313, 1316 n.2 (10th Cir. 1998). Thus, we apply the same analysis to Appellants' suit against Sheriff Whetsel in his official capacity as we do to their suit against the County. *Cf. Myers*, 151 F.3d at 1316 n.2.

"Under the Fourteenth Amendment due process clause, 'pretrial detainees are . . . entitled to the degree of protection against denial of medical attention which applies to convicted inmates' under the Eighth Amendment." *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009) (quoting *Garcia v. Salt Lake Cnty.*, 768 F.2d 303, 307 (10th Cir. 1985)). "A plaintiff states a cognizable Eighth Amendment claim for denial of medical attention if he 'alleges acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.'" *Olsen*, 312 F.3d at 1315 (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). In the Eighth Amendment context, "[d]eliberate indifference involves both an objective and subjective component."[5] *Id.* (quoting *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000)) (internal quotation marks omitted).

The objective component is met "if the deprivation is sufficiently serious—that is, if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize

---

[5] As we discuss *infra*, Appellants must also demonstrate "deliberate indifference" to impose municipal liability under § 1983. "Deliberate indifference, however, is defined differently for Eighth Amendment and municipal liability purposes." *Barney v. Pulsipher*, 143 F.3d 1299, 1307 n.5 (10th Cir. 1998). "In the prison conditions context, deliberate indifference is a subjective standard requiring actual knowledge of a risk by the official." *Id.* In contrast, "[i]n the municipal liability context, deliberate indifference is an objective standard which is satisfied if the risk is so obvious that the official should have known of it." *Id.*; *see generally Farmer v. Brennan*, 511 U.S. 825, 840–42 (1994). Here, we apply the Eighth Amendment definition of deliberate indifference. In Part II.C, we apply the municipal liability definition of deliberate indifference.

the necessity for a doctor's attention." *Id.* (quoting *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999)) (internal quotation marks omitted). More generally, in *Martinez*, we outlined key features of the objective component:

> The objective component of the test is met if the "harm suffered rises to a level 'sufficiently serious' to be cognizable under the Cruel and Unusual Punishment Clause" of the Eighth Amendment. . . . [I]t is the harm claimed by the prisoner that must be sufficiently serious to satisfy the objective component, and not solely "the symptoms presented at the time the prison employee has contact with the prisoner."

563 F.3d at 1088 (citation omitted) (quoting *Mata v. Saiz*, 427 F.3d 745, 752–53 (10th Cir. 2005)). Death is, "without doubt, sufficiently serious to meet the objective component necessary to implicate the [Eighth and] Fourteenth Amendment[s]." *Id.* at 1088–89 (citation omitted) (internal quotation marks omitted). Because Mr. Holdstock died in the jail, we conclude that there is sufficient evidence in the summary judgment record from which a reasonable jury could find that Mr. Holdstock suffered an objectively serious harm.

Next, we turn to the subjective component of deliberate indifference. The subjective component is satisfied "if an officer knows of and disregards an excessive risk to [a detainee's] health or safety." *Olsen*, 312 F.3d at 1315 (quoting *Sealock*, 218 F.3d at 1209) (alteration in original) (internal quotation marks omitted). We ask whether "the symptoms [were] such that a prison employee knew the risk to the prisoner and chose (recklessly) to disregard it[.]"

-15-

*Mata*, 427 F.3d at 753. The Supreme Court's decision in *Farmer*, from which our jurisprudence on this question has been derived, explains:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

511 U.S. at 837.

"Our cases recognize two types of conduct constituting deliberate indifference." *Sealock*, 218 F.3d at 1211. "First, a medical professional may fail to treat a serious medical condition properly. . . . The second type of deliberate indifference occurs when prison officials prevent an inmate from receiving treatment or deny him access to medical personnel capable of evaluating the need for treatment." *Id.* Notably, a prison medical professional who serves "solely . . . as a gatekeeper for other medical personnel capable of treating the condition" may be held liable under the deliberate indifference standard if she "delays or refuses to fulfill that gatekeeper role." *Id.*

In *Tafoya v. Salazar,* 516 F.3d 912 (10th Cir. 2008), we considered whether and under what circumstances a sheriff could be liable pursuant to § 1983 for a

-16-

sexual assault perpetrated by a guard against an inmate.[6]  "Because we f[ound] that [the sheriff] was aware of prison conditions that were substantially likely to result in the sexual assault of a female inmate, and [we] conclude[d] that a jury might infer that the assaults on [the plaintiff] were caused by these dangerous conditions," we reversed the district court's grant of summary judgment in favor of the sheriff.  *Id.* at 915.

In *Tafoya*, we emphasized that "[t]he official's knowledge of the risk need not be knowledge of a substantial risk to a *particular* inmate, or knowledge of the particular manner in which injury might occur."  *Id.* at 916; *accord Keith v. Koerner*, --- F.3d ----, 2013 WL 500703, at *3 (10th Cir. Feb. 12, 2013); *see also Farmer*, 511 U.S. at 843 (finding liability even though the prison official "did not know that *the complainant* was especially likely to be assaulted *by the specific prisoner* who eventually committed the assault" (emphases added)).  Moreover, "it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk . . .

---

[6]  The appellants in *Tafoya* sought to impose individual rather than municipal liability.  However, the question that must be answered in the individual liability analysis is essentially the same as the one that must be answered at the *first step* of the municipal liability inquiry: whether an individual officer committed a constitutional violation.  As such, *Tafoya* provides a useful guide for analyzing cases in which the failure to remedy ongoing constitutional violations, or circumstances that are likely to lead to such violations, causes harm to a particular detainee.  As discussed *infra*, to establish municipal liability, Appellants still need to take the *additional step* of demonstrating that a County policy or custom was the moving force behind the constitutional violation.

for reasons personal to him or because all prisoners in his situation face such a risk." *Farmer*, 511 U.S. at 843.

Here, Appellants submitted evidence that tends to demonstrate long-standing, systemic deficiencies in the medical care that the jail provided to detainees—specifically, that the detainees were not being seen for medical care in a timely manner, that medications were not being administered as directed, that follow-up care was not being provided to seriously ill detainees, and that the jail's design prevented effective monitoring and supervision of detainees with serious medical needs. Despite this ample evidence indicating constitutionally inadequate conditions at the jail, the district court reasoned:

> Plaintiffs complain that Mr. Holdstock could not be monitored while in his cell and/or that the long history of problems at the jail should have caused [the County] and/or Whetsel to act differently to Mr. Holdstock. However, there simply is no evidence from which any reasonable jury could find that on April 28, 2009, Mr. Holdstock faced death. Thus, it cannot be said that anyone recognized that risk existed and recklessly ignored it.

Aplts. App., Vol. I, at 20.

We respectfully disagree with the district court's analysis. To survive summary judgment, Appellants did not need to provide evidence that "on April 28, 2009, Mr. Holdstock faced death." Instead, Appellants merely needed to present evidence that Mr. Holdstock faced a substantial risk of serious harm of

-18-

which the prison officials were, or should have been, aware. *See Gonzales v. Martinez*, 403 F.3d 1179, 1183 (10th Cir. 2005) ("[A]n Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm *actually* would befall an inmate; it is enough that the official acted or failed to act *despite his knowledge* of a substantial risk of harm." (quoting *Farmer*, 511 U.S. at 842) (internal quotation marks omitted)); *see also Lopez*, 172 F.3d at 762 n.5 ("[A] prison official [may not] escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault." (quoting *Farmer*, 511 U.S. at 843) (alterations in original) (internal quotation marks omitted)).

"Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including *inference* from circumstantial evidence." *Gonzales*, 403 F.3d at 1183 (quoting *Farmer*, 511 U.S. at 842) (internal quotation marks omitted). Here, we conclude that Appellants have raised a triable issue of material fact regarding whether Sheriff Whetsel was aware of dangerous prison conditions that were substantially likely to result in constitutionally deficient medical care for seriously ill detainees. Furthermore, a reasonable jury also could infer that Mr. Holdstock's death was, in fact, caused by these dangerous conditions. Therefore, insofar as the district court found that Appellants could not survive summary judgment

-19-

regarding the existence of a constitutional violation—the first step in the municipal liability analysis—we conclude that the court erred.

## C

For purposes of municipal liability, in addition to establishing a violation of Mr. Holdstock's constitutional rights, Appellants must also show "that the county or its authorized decisionmaker 'intentionally deprived [Mr. Holdstock] of a federally protected right' *through its unconstitutional policy.*" *Lopez*, 172 F.3d at 763 (emphasis added) (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 405 (1997)); *see also Olsen*, 312 F.3d at 1318 (holding there was not municipal liability where, "[a]lthough Appellant may indeed show that Officer King has committed the prerequisite underlying Eighth Amendment violation, Appellant has not taken the subsequent step of linking the possible violation to a municipality custom or policy"). Stated differently, the unconstitutional policy must be the "moving force behind the injury alleged." *Barney*, 143 F.3d at 1307 (quoting *Brown*, 520 U.S. at 404) (internal quotation marks omitted). A municipality also may be liable under § 1983 for "an act performed pursuant to a 'custom' that has not been formally approved . . . on the theory that the relevant practice is so widespread as to have the force of law." *Brown*, 520 U.S. at 404 (quoting *Monell*, 436 U.S. at 690–691).

"[The] plaintiff must show that the municipal action was taken with the

requisite degree of culpability and must demonstrate a direct causal link between the municipal action and deprivation of federal rights." *Id.* The requisite degree of intent is "deliberate indifference to inmate health or safety."[7] *Lopez*, 172 F.3d at 763.

In the municipal liability context, "[t]he deliberate indifference standard may be satisfied when the [County] has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Barney*, 143 F.3d at 1307. Here, the County was notified in writing by the DOJ and the ADAC that deficiencies in the jail's medical care posed a serious risk to prisoner health and safety. Yet, despite having "received its warning," Aplts. App., Vol. II, at 450, the County failed to implement measures to remedy its "continued violation of detainees' Constitutional rights," *id.* at 437.

The failure to remedy ongoing constitutional violations may be evidence of deliberate indifference on the part of a municipality. *See Brown*, 520 U.S. at 407 ("[Municipal decisionmakers'] continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the

---

[7]    In Part II.B, we applied deliberate indifference in the context of an Eighth Amendment claim. Here, we apply deliberate indifference in the municipal liability context, and use an *objective* rather than *subjective* standard. *See supra* note 5.

'deliberate indifference'—necessary to trigger municipal liability." (quoting *City of Canton*, 489 U.S. at 390 n.10)).  Here, based on Appellants' references to (1) deficiencies described in the Death Investigation and Complaint Investigation Reports; (2) the OSDH's citations of the jail for violations; (3) the DOJ report; and (4) the ADAC report, a reasonable jury could find that the County's willingness—demonstrated by inaction—to permit seriously ill inmates to remain unmonitored in their cells evinces deliberate indifference for purposes of establishing municipal liability.[8]

The County may also "be liable on the basis that [Sheriff Whetsel] is a final policymaker with regard to its jail, such that his actions 'may fairly be said to be those of the municipality.'" *Lopez*, 172 F.3d at 763 (quoting *Brown*, 520 U.S. at 404); *see also Winton v. Bd. of Comm'rs of Tulsa Cnty., Okla.*, 88 F. Supp. 2d 1247, 1270 (N.D. Okla. 2000) ("The Sheriff's actions or inactions, as the final policy maker for the Jail, are attributable to the County.").  Here, a reasonable jury could conclude that Sheriff Whetsel was on notice of constitutional deficiencies in the care of seriously ill detainees, and that his failure to take appropriate measures to remedy these deficiencies constituted deliberate indifference.  *See Tafoya*, 516 F.3d at 920 (holding that previous assaults "should

---

[8]    In this vein, it is at least arguable that the County's willingness to continue employing CHMO, without sufficient oversight or quality control, could be evidence of deliberate indifference, especially where Appellants have pointed to reports that reflect a lack of adequate medical care and deaths at the jail.

have served as a wake-up call," and that failing to take appropriate measures to protect against future assaults could rise to the level of deliberate indifference); *Dyer v. Bd. of Cnty. Comm'rs for Okla. Cnty.*, No. CIV-09-207-M, 2009 WL 3245419, at *2–3 (W.D. Okla. Oct. 1, 2009) ("Having reviewed the parties' submissions [on the sheriff's motion for summary judgment on a pretrial detainee's § 1983 claim], the Court finds that plaintiff has presented sufficient evidence that [the sheriff] had direct and actual knowledge of a substantial risk of inmate attacks as documented . . . in the [DOJ] Report concerning the Detention Center.").

With regard to the issue of whether the County's policies or customs were "the moving force" behind the violation of Mr. Holdstock's constitutional rights, *see Brown*, 520 U.S. at 404, the district court concluded that Appellants had failed to demonstrate how Mr. Holdstock's death could have been prevented by the County, *see* Aplts. App., Vol. I, at 20–21. We disagree. Appellants have presented sufficient evidence to demonstrate a "direct causal link," *see Brown*, 520 U.S. at 404, between the County's (in)action and the deprivation of Mr. Holdstock's constitutional right to receive adequate medical care. Notably, a reasonable jury could find that, had Mr. Holdstock's cell been monitored on a more regular basis, prompt intervention would have prevented his death. More generally, a reasonable jury could find that the County and Sheriff Whetsel were on notice as to the problems with the jail's medical-care system, and that had they

taken any number of possible remedial actions—many of which were explicitly identified by the DOJ and OSDH—Mr. Holdstock's condition would not have deteriorated and his death could have been avoided by timely medical intervention.

Accordingly, Appellants have "presented evidence of disputed material facts sufficient to create a genuine question as to whether [the County] was deliberately indifferent to the conditions at the [jail]," *Tafoya*, 516 F.3d at 921, and regarding whether the County's policies were the moving force behind Mr. Holdstock's death. As such, we reverse the grant of summary judgment in favor of Sheriff Whetsel and the County on Appellants' § 1983 claim.

**D**

In addition to their § 1983 claim, Appellants pleaded a claim against each defendant for wrongful death and a claim for the violation of both Oklahoma tort law and "the Oklahoma Constitution, statutory law, [and] common law." Aplees. App., Vol. I, at 7–8. Although the summary-judgment briefing before the district court was not limited to the § 1983 claim, the district court's entire discussion of Appellants' state law claims in its summary judgment order consists of one paragraph and relates only to CHMO's motion for summary judgment.[9]

---

[9] The district court ruled as follows:

(continued...)

-24-

Appellants state that "the [district court's opinion] did not address [their] state court claims against Defendant Sheriff and [the County]." Aplts. Opening Br. at 28. To the contrary, although the district court did not *discuss* the state-law claims as they applied to the non-CHMO defendants, it nonetheless *ruled* on the claims by granting the summary judgment motions of Sheriff Whetsel and the County without limitation.

Appellants aver that "[s]ummary [j]udgment is . . . improper." Aplts. Opening Br. at 29. Notably, their discussion of the issue focuses only on the fact that a tort action is different from a § 1983 claim. In other words, Appellants appear to assume that the district court dismissed their state-law claims on the grounds that a tort claim is the same as a § 1983 claim. According to Sheriff

---

[9](...continued)
> Turning to the state law claims: CHMO argues that Plaintiffs cannot establish a claim of medical negligence because they have no expert testimony. To the contrary, the same facts and testimony which demonstrate that CHMO's employees acted with deliberate indifference are sufficient to satisfy the elements of a medical negligence claim under Oklahoma law. Thus, to the extent CHMO seeks summary judgment on that claim, it will likewise be denied. Whether or not CHMO is entitled to the protections of Oklahoma's Governmental Tort Claims Act and its exception to the waiver of sovereign liability was not raised by this Defendant and therefore has not been considered by the Court.

Aplts. App., Vol. I, at 21–22.

Whetsel and the County, "Appellants appear to be correct when they state that the trial court did not address their state law claims," Aplees. Br. at 17; they ask us to either rule that the state-law claims are barred, or to "refer the issue to the trial court for its ruling on the issue," *id.* at 18.[10]

In sum, Appellants pleaded state-law claims against Sheriff Whetsel and the County, but the district court did not discuss them in its decision. Nonetheless, the court granted summary judgment in full as to those defendants. Instead of reaching Appellants' state-law claims in the first instance, we vacate the district court's judgment on those claims and remand for the court to provide an explicit determination as to their merits. *Cf. Perkins v. Kan. Dept. of Corr.*, 165 F.3d 803, 807, 811 (10th Cir. 1999) (affirming in part, reversing in part, and remanding the case to the district court, which had dismissed the plaintiff's action

---

[10]    The County and Sheriff Whetsel present no substantive arguments relating to Appellants' state-law claims in their brief before this court. Instead, they reference the arguments they made in their motion for summary judgment before the district court, and signal only that "those arguments are incorporated herein." Aplees. Br. at 18. We note that this practice is disfavored and counsel who resort to it do so at their peril. *See* 10th Cir. R. 28.4 ("Incorporating by reference portions of lower court . . . briefs or pleadings is disapproved and does not satisfy the requirements of Fed. R. App. P. 28(a) and (b)."); *Concrete Works of Colo., Inc. v. City & Cnty. of Denver*, 321 F.3d 950, 979 n.14 (10th Cir. 2003) ("This court is under no obligation to consider arguments not fully set forth in a party's appellate brief, including arguments incorporated by reference to prior pleadings or other materials."); *accord Lauck v. Campbell Cnty.*, 627 F.3d 805, 814–15 (10th Cir. 2010). However, given our disposition with respect to the state-law claims, we have no need to further explore the implications of this delict.

in its entirety despite "explicitly address[ing]" only certain claims, and directing the district court to address those claims "which it did not consider initially").

## III

For the foregoing reasons, we **REVERSE** the district court's grant of summary judgment to Sheriff Whetsel and the County on Appellants' § 1983 claim.  We **VACATE** the grant of summary judgment on Appellants' state-law claims and **REMAND** for further proceedings consistent with this opinion.


ENTERED FOR THE COURT


Jerome A. Holmes
Circuit Judge