22 F.3d 995
 ESTATE OF Jacinda Sue Hocker, by Jerry HOCKER,
Administrator, Plaintiff-Appellant,
v.
John J. WALSH, Jr., individually and in his official
capacity as Sheriff of Cleveland County, Oklahoma, and the
Board of County Commissioners of Cleveland County, Oklahoma,
on behalf of Cleveland County, Oklahoma, Defendants-Appellees.
 No. 93-6066.
 United States Court of Appeals,
Tenth Circuit.
 April 20, 1994.
 
 Mark Hammons, of Hammons & Associates, Oklahoma City, OK, for plaintiff-appellant.
 William R. Holmes, Asst. Dist. Atty. for Cleveland County, Norman, OK, for defendants-appellees.
 Before TACHA and BARRETT, Circuit Judges, and KANE,* District Judge.
 TACHA, Circuit Judge.
 
 
 1
 Jacinda Sue Hocker committed suicide by hanging herself while being detained at the Cleveland County Detention Center in Norman, Oklahoma. Plaintiff-appellant Jerry Hocker, the father of decedent and the administrator of her estate, filed suit under 42 U.S.C. Sec. 1983 against the Board of County Commissioners of Cleveland County ("Cleveland County") and John J. Walsh, Jr. individually and in his official capacity as sheriff of Cleveland County ("Sheriff Walsh"). Plaintiff alleged that Sheriff Walsh and Cleveland County (collectively the "defendants") were deliberately indifferent to the serious medical needs of his daughter due to unconstitutional policies and customs established by Sheriff Walsh as supervisor of the jail. Plaintiff also asserted a claim for state law negligence. The federal magistrate judge[1] granted defendants' motion for summary judgment on plaintiff's federal claims and dismissed without prejudice the state law negligence claim. Plaintiff now appeals. We exercise jurisdiction under 28 U.S.C. Sec. 1291 and affirm.
 
 I. Background
 
 2
 On the morning of May 11, 1989, police officers James Maisano and Darla McClure were dispatched to the Holiday Inn in Norman, Oklahoma. Upon arriving at the motel, the officers were directed to the swimming pool area where they found Ms. Hocker asleep on a small sofa. On a nearby table the officers observed a syringe and a purse containing pink capsules and a small plastic bag with a white powdery substance inside. Officer McClure gently nudged Ms. Hocker on the shoulder, at which time she awoke, stood up and conversed with the officers. She was slightly unsteady in her balance and gave incomplete responses to the officers' questions. At some point during the investigation, the officers also discovered Tommy Tompkins, Ms. Hocker's boyfriend, inside the motel. Based upon their observations, the officers arrested both Ms. Hocker and Mr. Tompkins for trespass, public intoxication and possession of controlled dangerous substances.
 
 
 3
 Officer Maisano proceeded to transport Ms. Hocker and Mr. Tompkins to the Cleveland County Detention Center ("Detention Center" or "Center"). Ms. Hocker walked to Officer Maisano's patrol car without any assistance, she carried on a conversation with Mr. Tompkins in the back seat of the car on the way to the Detention Center, and she walked under her own power to the book-in window at the Center. The book-in sheet describes Ms. Hocker as being "semi" coherent with "poor" ease of movement and notes that she was not violent or self-destructive, was not on medication and had no bruises, lesions or other symptoms.
 
 
 4
 The Detention Center has a policy of placing intoxicated individuals in the receiving section[2] of the Center so that they can be closely monitored until they are sufficiently sober to enter the Center's general population or are bailed out of the Center. The Center also has a policy of refusing to accept individuals who appear to be in need of medical treatment. Ms. Hocker was placed in the receiving section of the Detention Center at approximately 8:35 a.m. on May 11, 1989, because her state of intoxication was not deemed so severe as to require medical treatment.
 
 
 5
 A jail log entry made at 12:00 p.m. on May 11, 1989, notes that "Hocker and Tompkins would not wake up." An entry made at 1:10 p.m. reads: "Hocker and Tompkins appear asleep[,] still to [sic] intox. to process[,] poss. drug abuse on both; very incoherent." A 2:40 p.m. entry states: "I tried to wake up Hocker ... still very incoherent; would not wake up." Entries made at 4:20 p.m. and 7:00 p.m. both state that Mr. Tompkins and Ms. Hocker "still intoxicated." The following day, May 12, 1989, a log entry made at 5:49 a.m. states: "Tried to process Hocker, Jacinda, through the evening but subject was too intoxicated. Finally was able to process Hocker at 0549. She still was somewhat intoxicated but was able to complete processing."
 
 
 6
 On the afternoon of May 12, 1989, Ms. Hocker was released for nearly two hours to make initial appearances on criminal charges before a judge of the District Court of Cleveland County and before a judge of the Municipal Court of Norman, Oklahoma. At 10:00 p.m. that evening, Ms. Hocker was moved upstairs to a general population cell.
 
 
 7
 On the morning of May 13, 1989, an inmate at the Detention Center received a note from Ms. Hocker addressed to Mr. Tompkins.[3] That afternoon at approximately 5:00 p.m., an attorney, Joel Wade Barr, talked with Ms. Hocker in the visitation area of the Center at the request of Mr. Tompkins. At 6:30 p.m., Deputy Cathy D. Suttle was serving the evening meal when she discovered Ms. Hocker in her cell hanging from the upper bunk with a towel around her neck. Deputy Suttle cut through the towel with a pocket knife and laid the body down. By this time, Deputy Suttle's supervisor, Sergeant Jo Brinda Noble, had arrived at Ms. Hocker's cell. Sergeant Noble searched for vital signs. None were found. Ms. Hocker had no pulse, her skin was cool, and lividity was present in her lower extremities.
 
 
 8
 Plaintiff filed suit against Cleveland County and Sheriff Walsh individually and in his official capacity alleging that they were deliberately indifferent to the serious medical needs of Ms. Hocker. Plaintiff contended that Sheriff Walsh had established an unconstitutional policy and custom of admitting unconscious, intoxicated arrestees to the Center. The magistrate judge granted the defendants' motion for summary judgment, finding as a matter of law that the defendants were not deliberately indifferent to Ms. Hocker's serious medical needs because Ms. Hocker did not exhibit a serious medical need and because the Detention Center staff did not know and had no reason to know of the specific risk that Ms. Hocker would commit suicide. Plaintiff now appeals.[4]
 
 II. Discussion
 A. Standard of Review
 
 9
 We review the grant of summary judgment de novo, using the same standard applied by the district court. Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir.1990). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "When applying this standard, we examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." Applied Genetics, 912 F.2d at 1241. "However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." Id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)). An issue of material fact is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to defeat a properly supported motion for summary judgment. Id. at 252, 106 S.Ct. at 2512.
 
 
 10
 B. Deliberate Indifference to Serious Medical Needs
 
 
 11
 Under the Fourteenth Amendment's Due Process Clause, pretrial detainees are entitled to the same degree of protection against denial of medical care as that afforded to convicted inmates under the Eighth Amendment. Frohmader v. Wayne, 958 F.2d 1024, 1028 (10th Cir.1992). Thus, plaintiff's claim for inadequate medical attention must be judged against the "deliberate indifference to serious medical needs" test of Estelle v. Gamble, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976). Martin v. Board of County Comm'rs, 909 F.2d 402, 406 (10th Cir.1990). Relying on Garcia v. Salt Lake County, 768 F.2d 303 (10th Cir.1985), plaintiff contends that Sheriff Walsh and Cleveland County were deliberately indifferent to the serious medical needs of Ms. Hocker.
 
 
 12
 In Garcia, the Salt Lake County Jail had an unwritten policy of admitting unconscious individuals who were suspected of being intoxicated. Mr. Garcia, who was suspected of being intoxicated, was apparently admitted to the jail in an unconscious state at approximately 3:45 p.m., was observed to still be unconscious at 8:30 p.m. and was found dead at about 10:15 p.m. A medical doctor testified that Mr. Garcia would have survived if he had been transported to the hospital when observed at 8:30 p.m. and found to be unconscious. Finding gross deficiencies in the jail's staffing and procedures, we held that Salt Lake County was deliberately indifferent to the serious medical needs of Mr. Garcia: "The record supports the conclusion that the County's policy of admitting to jail unconscious persons suspected of being intoxicated, carried out with the described deficiencies and indifference, caused a violation of Garcia's constitutional rights." Id. at 308 (footnote omitted).
 
 
 13
 Citing Garcia, plaintiff argues that Sheriff Walsh had established a policy of admitting intoxicated, unconscious individuals to the Detention Center and that therefore Sheriff Walsh and Cleveland County were deliberately indifferent to the serious medical needs of Ms. Hocker. Plaintiff's argument is flawed. It is premised on the assumption that Ms. Hocker was in fact unconscious while at the Detention Center. The record, however, shows that Ms. Hocker was neither admitted to the Detention Center in an unconscious state nor observed to be unconscious after being admitted to the Center.
 
 
 14
 With regard to Ms. Hocker's condition at the time of her admission, the book-in sheet describes her as being "semi" coherent with "poor" ease of movement. This is not evidence of unconsciousness, especially when viewed in the context of the events occurring shortly prior to her admission to the Detention Center: Ms. Hocker conversed with the officers at the Holiday Inn, she walked without assistance to Officer Maisano's patrol car, she talked with her boyfriend in the back of the patrol car on the way to the Detention Center and she walked to the book-in window under her own power.
 
 
 15
 With regard to Ms. Hocker's condition after admission, plaintiff points to two entries made in the jail log to support his claim that Ms. Hocker was unconscious on the afternoon of May 11, 1989, the day Ms. Hocker was admitted to the Detention Center. The first entry, made at 12:00 p.m., states: "Hocker and Tompkins would not wake up." The second entry was made at 2:40 p.m. and reads: "I tried to wake up Hocker ... still very incoherent; would not wake up." The magistrate judge reviewed the log entries and concluded:
 
 
 16
 The notes in the log state that Hocker would not wake up, not that she could not be awakened or that she was not responding at all to jail employees. The notes reflect a voluntary choice by Hocker not to be awakened, as opposed to an involuntary condition of unconsciousness.
 
 
 17
 Plaintiff contends that in reaching this conclusion the magistrate judge ignored the requirement of viewing the evidence in the light most favorable to the party opposing summary judgment, see Applied Genetics, 912 F.2d at 1241, because an equally valid inference is that Ms. Hocker was unconscious during the afternoon of May 11, 1989. We disagree.
 
 
 18
 Our duty on summary judgment is to "examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." Id. (emphasis added). We decline plaintiff's invitation to view in isolation the phrase "would not wake up" contained in the 12:00 p.m. and 2:40 p.m. jail log entries. Plaintiff's exclusive focus on the phrase "would not wake up" ignores the factual context in which the log entries were made. The reasonable inference from the log entries as a whole is that Ms. Hocker was incoherent, not unconscious, during the afternoon of May 11, 1989.[5]
 
 
 19
 The 12:00 p.m. entry is preceded by an 8:35 a.m. entry stating that Ms. Hocker was "semi" coherent and is followed by a 1:10 p.m. entry noting that she was "very incoherent." The 2:40 p.m. entry uses the phrase "would not wake up" in conjunction with the words "still very incoherent," and the subsequent entries note that Ms. Hocker was "still intoxicated." "Incoherent" and "intoxicated," however, are not synonymous with "unconscious." Plaintiff's attempt to alter the contextual meaning of the 12:00 p.m. and 2:40 p.m. log entries by focusing on a single phrase in each is unavailing.[6]
 
 
 20
 In sum, the log entries as a whole indicate that, due to her intoxicated state, Ms. Hocker was very incoherent, not that she was unconscious. The facts simply do not support plaintiff's claim under Garcia that Sheriff Walsh and Cleveland County were deliberately indifferent to Ms. Hocker's serious medical needs by establishing a policy of admitting unconscious, intoxicated arrestees to the Detention Center. Because "a reasonable jury could [not] return a verdict for [plaintiff]," Anderson, 477 U.S. at 248, 106 S.Ct. at 2510, no genuine issue of material fact exists and summary judgment is appropriate on this issue.[7]
 
 
 21
 Plaintiff also argues that, because the Detention Center staff knew Ms. Hocker was intoxicated, the defendants were deliberately indifferent to the risk that Ms. Hocker would commit suicide by not providing her with medical treatment. Plaintiff's argument again misses the mark. Though not a prisoner suicide case, in Berry v. City of Muskogee, 900 F.2d 1489 (10th Cir.1990), we held that to establish deliberate indifference to an inmate's safety the plaintiff must show (1) "actual knowledge of the specific risk of harm [to the detainee] ... or that the risk was so substantial or pervasive that knowledge can be inferred;" (2) "fail[ure] to take reasonable measures to avert the harm;" and (3) that "failure to take such measures in light of [the] knowledge, actual or inferred, justifies liability for the attendant consequences of [the] conduct, even though unintended." Id. at 1498 (citations omitted); see also Bowen v. City of Manchester, 966 F.2d 13, 17 (1st Cir.1992) (holding that a plaintiff may establish deliberate indifference in a prison suicide case by showing that the detainee exhibited strong signs of suicidal tendencies, that the jail officials had actual knowledge of, or were willfully blind to, the specific risk that the detainee in question would commit suicide and that the jail officials then failed to take steps to address that known, specific risk); Barber v. City of Salem, Ohio, 953 F.2d 232, 239-240 (6th Cir.1992) (same); Bell v. Stigers, 937 F.2d 1340, 1343-44 (8th Cir.1991) (same); Popham v. City of Talladega, 908 F.2d 1561, 1563-64 (11th Cir.1990) (same).
 
 
 22
 Here, no facts suggest that the Detention Center staff had knowledge of the specific risk that Ms. Hocker would commit suicide.[8] Nor do the facts suggest that Ms. Hocker's risk of suicide was so substantial or pervasive that knowledge can be inferred. Though the staff obviously knew that Ms. Hocker was intoxicated or under the influence of drugs, intoxication with its accompanying incoherence does not, by itself, give the Detention Center staff knowledge that Ms. Hocker posed a specific risk of suicide. See Colburn v. Upper Darby Township, 946 F.2d 1017, 1026 (3d Cir.1991) (holding that a detainee's intoxication is insufficient to give jail officials knowledge that the particular detainee poses a suicide risk); Belcher v. Oliver, 898 F.2d 32, 35 (4th Cir.1990) (same); State Bank of St. Charles v. Camic, 712 F.2d 1140, 1146 (7th Cir.) (same), cert. denied, 464 U.S. 995, 104 S.Ct. 491, 78 L.Ed.2d 686 (1983). Summary judgment therefore is appropriate on this claim as well.
 
 III. Conclusion
 
 23
 Plaintiff's claim that defendants were deliberately indifferent to Ms. Hocker's serious medical needs is without factual support. We AFFIRM the district court's grant of summary judgment in favor of defendants.
 
 
 
 *
 The Honorable John L. Kane, Senior District Judge, United States District Court for the District of Colorado, sitting by designation
 
 
 [1]
 Plaintiff filed suit in the United States District Court for the Western District of Oklahoma. Upon consent of the parties, the case was assigned for trial to United States Magistrate Judge Ronald Howland
 
 
 [2]
 The receiving section consists of a common area with six adjacent individual cells. The windows looking into the receiving section provide a complete view of the common area
 
 
 [3]
 The note read as follows: "I am upstairs now # 232--I'm scared baby--I miss you so much! I just want to hold you--I hope we get out of this mess soon, because I'm marring [sic] you! I think about you every minute. I love you so much! Cindy." The Detention Center staff did not discover this note until after Ms. Hocker's death
 
 
 [4]
 We grant plaintiff's motion to supplement the appendix and to amend the issues presented in the docketing statement
 
 
 [5]
 To the extent that plaintiff's claim rests on Ms. Hocker's alleged state of unconsciousness after May 11, 1989, it is entirely without merit. On May 12, 1989, jail log entries indicate that Ms. Hocker was still somewhat intoxicated in the morning but that she made two court appearances in the afternoon and was moved to a general population cell late that evening. On May 13, 1989, Ms. Hocker was able to write a coherent note to her boyfriend in the morning and visit with attorney Barr late that afternoon
 
 
 [6]
 Plaintiff cites deposition testimony of Cleveland County Jail Administrator Kenneth Zane to support his claim that the log entries indicate that Ms. Hocker was unconscious. Mr. Zane, however, had no contact with Ms. Hocker and his testimony suffers from the same defect as the plaintiff's argument above--it is based solely on the two entries without the benefit of the larger factual context in which the entries were made. Based on the entirety of the log entries, a reasonable jury could not conclude that Ms. Hocker was unconscious and Mr. Zane's testimony therefore does not create a "genuine" issue of material fact
 
 
 [7]
 Plaintiff argues that the Oklahoma Minimum Jail Standards created a liberty interest in Ms. Hocker. We need not address this argument, however, because the facts do not indicate that the jail standards were violated in this case. Sheriff Walsh established policies essentially mirroring the Oklahoma Minimum Jail Standards and the jail personnel followed these standards in admitting Ms. Hocker and in determining that she did not exhibit a serious need for medical treatment
 
 
 [8]
 Attorney Barr, who used to work as a jailer in Cleveland County, testified that, based on his conversation with Ms. Hocker, he had no idea that she posed a risk of suicide. He stated: "I was concerned that I had failed to perceive a person in distress and I can tell you absolutely when I left there, I left with no feeling that I had talked to anyone in that kind of distress." Though Mr. Barr's testimony is irrelevant for determining whether the Detention Center staff had actual or inferred knowledge of Ms. Hocker's specific risk of suicide, his testimony lends additional support to our finding that the staff had no reason to suspect that Ms. Hocker posed a risk of suicide