**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**November 8, 2013**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

RON duBOIS and THORA duBOIS,
Husband and Wife, and as Co-Special
Administrators of the Estate of Peter
duBois, Deceased,

        Plaintiffs - Appellants,

    v.

PAYNE COUNTY BOARD OF
COUNTY COMMISSIONERS, State
of Oklahoma; R. B. HAUF, Sheriff of
Payne County, State of Oklahoma, in
his individual and official capacities;
REESE LANE, Payne County Jail
Administrator, in his individual and
official capacities; JOHN DOES 1
THROUGH 5 as unknown Deputy
Sheriffs/Employees of the Payne
County Sheriffs Department, in their
official and individual capacities,

        Defendants - Appellees.

    and

ADVANCED CORRECTIONAL
HEALTHCARE, INC.,

        Defendant.

No. 13-6144

(W.D. Oklahoma)

(D.C. No. 5:12-CV-00040-L)

---

**ORDER AND JUDGMENT**[*]

---

[*]This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. The court

                      (continued...)

Before **TYMKOVICH**, **ANDERSON**, and **BACHARACH**, Circuit Judges.

After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal. See Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

Plaintiffs and appellants are Ron and Thora duBois, husband and wife and co-special Administrators of the Estate of Peter duBois, their deceased son. They appeal the grant of summary judgment to defendants and appellees (the Board of County Commissioners of Payne County ("County Board" or "Board"); R. B. Hauf, the Sheriff of Payne County ("Sheriff Hauf"); and Reese Lane, the Payne County Jail Administrator (Mr. Lane"))[1] in their 42 U.S.C. § 1983 action against the defendants, following Peter's suicide while he was incarcerated in the Payne County Jail. For the following reasons, we affirm.

---

[*](...continued)
generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 32.1.

[1]Additional defendants initially included Advanced Correctional Healthcare, Inc. ("ACH"), and the Payne County Sheriff's Office. ACH provided medical care at the Detention Center at the time of Peter's incarceration. Plaintiffs asserted a state law wrongful death claim against ACH. They eventually settled their claim against ACH. Plaintiffs agreed to the dismissal of the Sheriff's Office.

**BACKGROUND**

On July 13, 2010, Peter duBois ("Peter") was booked into the Payne County Jail ("PCJ" or "Jail") on drug-related charges. Pursuant to PCJ policy and routine practice, he was asked questions about his medical history and condition in order to complete a medical questionnaire. These questions included whether he had any psychiatric disorders and whether he currently took any medications prescribed by a doctor. Peter told the booking officer that he suffered from depression, arthritis in his back, tachycardia and high blood pressure, and that he had been prescribed Methadone, Hydromorphone, Metoprolol, Clonidine, and Cymbalta. The questionnaire also noted that Peter responded in the negative when asked, "[d]o you have any problems when you stop drinking or using drugs?" and "[h]ave you ever attempted suicide or are you thinking about it now?" Appellant's App. Vol. 1 at 185. The questionnaire further requires the booking officer to make a visible assessment of the prisoner, including whether the prisoner has any visible signs of alcohol or drug withdrawal, appears to be under the influence of any drugs or alcohol, or appears to have any psychiatric problems. Id. at 184.

At the time of Peter's incarceration, medical care at the Jail was provided by ACH. On the same date he was booked, Peter submitted a Sick Call Request Form, on which he asked to see a doctor or nurse due to "withdraws [sic] from Methadone, Arthritis in Back, Tackacardia [sic], High blood pressure." Id. at

189. Accordingly, on July 14, 2010, Peter was seen by Christy Williams, a licensed practical nurse employed by ACH. Nurse Williams' chart notes reflect that Peter complained that he was unable to eat or drink, that his heart felt like it was jumping out of his chest, and that he was dehydrated, shaky and nauseated. In her notes, Ms. Williams indicates she would "contact [a doctor] for orders for withdrawls [sic]." Id.

Nurse Williams contacted Dr. Charles Olson, Jr., the ACH doctor on call, who authorized giving the following medications to Peter: 50 milligrams of Vistaril, to be given by mouth twice daily for three days; 0.1 milligrams of Clonidine, to be given by mouth twice daily for three days; 10 milligrams of Celexa, to be given by mouth daily; and 50 milligrams of Metoprolol, to be given by mouth twice daily. Although Dr. Olson authorized the continuation at the same dose of two of the medications Peter had been taking (Clonidine and Metoprolol), he did not authorize Peter's continued use of Methadone, the last dose of which he had taken the morning of July 12, 2010. Ms. Williams scheduled Peter to see Dr. Olson on July 21, 2010, the next time Dr. Olson would be at the Detention Center.

The Clonidine and Vistaril were prescribed to treat Peter's symptoms from his withdrawal from Methadone.[2] Peter received his first dose of Vistaril at 6:00

---

[2]Vistaril is an "antihistamine, which 'is commonly used for itching . . . anxiety and panic disorder[.] [I]t also can be used for nausea." Order at 3 n.3,
(continued...)

p.m. on July 15, 2010, and his last dose at 6:00 p.m. on July 18, 2010.  He received his first dose of Clonidine at 6:00 p.m. on July 14, 2010, and the last dose at 6:00 p.m. on July 18.  Although the prescription stated Peter was to receive two doses of Clonidine daily for three days, he in fact only received one dose on July14 and 15, and two doses on July 16, 17 and 18.  As the district court noted, "[a]lthough both parties' experts acknowledge that opiate withdrawal [as from a medication like Methadone] can be painful, there is no indication in the record that Peter was ever given any medication for pain."  Order at 4, Appellant's App. Vol. 5 at 1812.

After he was booked, Peter was initially placed in the "south detox observation cell" where he was checked by Detention Center staff every 15 minutes.  The Observation Checklist reflected that the reason for Peter's cell assignment was "methadone."  After he saw Nurse Williams, Peter was moved from the detox cell to cell 103, where he remained for less than 10 minutes.  He was then placed in cell H106, which Nurse Williams authorized because it was "warmer, quieter" and he "would have an emergency button right there in his cell that he could push if he had problems."  Peter remained in cell H106 until 6:06 p.m. on July 15, 2010, when he was moved back to the south detox cell for

_____

[2](...continued)
Appellant's App. Vol. 5 at 1811.  Clonidine "is a blood pressure medication. Dr. Olson testified that it helps with the rapid heart rate, can help a little bit with agitation or difficulty sleeping."  Id. at n.4.

allegedly hiding medication. Less than twenty-four hours later, Peter was transferred to C pod in the general population of the Detention Center.

On July 19, 2010, the day after Peter received his last doses of the medications prescribed for his withdrawal symptoms, he committed suicide by diving off the second floor of the Detention Center. The fall resulted in severe head injuries, from which he died on July 23, 2010. Prior to the fall, a fellow inmate, Kenneth Eugene Lane, Jr., notified various jailers (including Lieutenant Nick Myers) that Peter was talking about committing suicide. When Kenneth expressed concern about Peter, at least a few of the jailers to whom he had spoken said that they would pass on the information to the medical staff. Plaintiffs aver that never happened.

Because the policies and protocols of the Detention Center are critical to the analysis of the issues in this case, we describe them, as stated in the district court's order:

> Prior to May 2010, the jail's written policies provided for "gradual, supervised detoxification programs for substance abusers." Ex. 40 to Plaintiffs' Appendix at 30. The written policies provided:
>
> > It is expected that most substance abuse cases can be managed in the jail under normal circumstances.
> >
> > . . . .
> >
> > When the jail physician deems in-house detoxification care as [sic] sufficient, the inmate's individual treatment program will specify housing requirements, treatment procedures, or any necessary referrals.

> Medical staff will inform the inmate management team of any diagnosis of chemical dependency and will determine if the inmate requires any special housing such as confinement in a single cell for detoxification purposes.
>
> When an inmate is diagnosed as being so chemically dependent as to require on-going medication, the jail physician will develop an individualized treatment program. In these cases, the inmate will remain under medical staff supervision at all times during their withdrawal period.

Id. at 30-31. Once ACH began providing health care at the Detention Center, the detoxification policy was superseded by an ACH protocol. Exhibit 2 to Hauf Motion at 126-27. The ACH opiate withdrawal protocol provided that the inmate was to be placed "in holding observation unit" and that "Medical is to see all detainees who have been treated with withdrawal protocols." Exhibit 25 to Plaintiffs' Appendix at 1. The protocol specified the medication of choice was 25 milligrams of Vistaril twice a day for five days together with 0.2 milligrams of Clonidine twice a day for five days. Id. Finally, the protocol instructed "**If detainee has any medical issues, or after 5 days of treatment, re-evaluate and call physician for further orders.**" Id.

Likewise, the jail's prior written policy regarding suicide was superseded once ACH began providing healthcare services at the Detention Center. Exhibit 2 to Hauf Motion at 126-27. The suicide management/risk reduction policy in effect prior to May 2010 provided that

> Detention Officers in housing units or other persons will advise the Shift Supervisor of any potentially self-destructive behavior (related to a potential suicide) displayed by an inmate.
>
> If an inmate declares a Psychological Emergency the Shift Supervisor will be advised. The Shift Supervisor will notify the appropriate [Qualified Health Services Staff ("QHSS")].

-7-

. . . .

> When observation, history, or interview suggests that an inmate is potentially suicidal, the following steps will be implemented by QHSS, or in the absence of Health Services staff, the Duty Officer.
>
> a.    The inmate may be kept in an approved Isolation Management Room (IMR) for closer observation.
>
> b.    The inmate may be placed on a Suicide Observation Status. . . .
>
> c.    The inmate may be referred to an appropriate outside treatment facility for further evaluation.  (Decision is sole province of Medical/Mental Health Staff, with approval by Jail Administrator or designee.)  In all cases, referral to a local hospital emergency department is an option.

Order at 5-7.  As the district court further stated, the "record does not reflect whether ACH had a suicide prevention protocol as neither party provided one to the court.  Williams, however, testified that she received no specialized training on opiate withdrawal or suicide prevention."  Id. at 7.

On January 12, 2012, the plaintiffs (Peter's parents, as co-special administrators of his estate) filed this action seeking damages pursuant to 42 U.S.C. § 1983 for violations of Peter's constitutional rights.  As indicated, the defendants were the County Board, the Payne County Sheriff's Office (which was subsequently dismissed), Sheriff Hauf, in both his official and individual capacities, and Mr. Lane, in both his official and individual capacities.

-8-

Ultimately, the Board, Sheriff Hauf and Mr. Lane filed motions for summary judgment. The district court granted those motions. This appeal followed.

Plaintiffs argue that: (1) Sheriff Hauf and Mr. Lane violated Peter's constitutional rights by contributing to/causing his death; (2) PCJ's policies and practices, or lack thereof, led to Peter's death; (3) Sheriff Hauf and Mr. Lane are not entitled to qualified immunity in their individual capacities; and (4) the Board is a proper party to the plaintiffs' 42 U.S.C. § 1983 action.

**DISCUSSION**

**I. Standard of Review**

"We review a district court's grant of summary judgment de novo, applying the same standard as the district court." Helm v. Kansas, 656 F.3d 1277, 1284 (10th Cir. 2011). More specifically, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "We view the summary judgment evidence in the light most favorable to the non-movant." Bertsch v. Overstock.com, 684 F.3d 1023, 1027 (10th Cir. 2012). Furthermore, "at the summary judgment stage the judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there

is a genuine issue for trial."  Randle v. City of Aurora, 69 F.3d 441, 453 (10th

Cir. 1995).  We apply that standard of review to the following issues.

**II.     Did Sheriff Hauf and Mr. Lane Violate Peter's Constitutional Rights?**

Plaintiffs argue that Sheriff Hauf and Mr. Lane violated Peter's

constitutional rights because:  (a) they knew of Peter's complaints and condition

and failed to take action; (b) they knew of a substantial risk of serious harm in

their facility (PCJ); (c) the presence of medical professionals does not absolve

prison officials like Sheriff Hauf and Mr. Lane; and (d) they are gatekeepers who

failed in their responsibility.

"[C]laims based on a jail suicide are considered and treated as claims based

on the failure of jail officials to provide medical care for those in their custody."

Barrie v. Grand County, 119 F.3d 862, 866 (10th Cir. 1997).  Thus, such claims

"must be judged against the 'deliberate indifference to serious medical needs' test

of Estelle v. Gamble, 429 U.S. 97, 104 (1976)."  Estate of Hocker v. Walsh, 22

F.3d 995, 998 (10th Cir. 1994).  In Estelle, the Supreme Court held that deliberate

indifference to a prisoner's serious medical needs constitutes cruel and unusual

punishment under the Eighth Amendment, giving rise to a civil rights action

under § 1983.  Estelle, 429 U.S. at 104.

> The test for a "deliberate indifference" claim under the Eighth
> Amendment  has both an objective and a subjective component.  The
> objective component of the test is met if the harm suffered is
> sufficiently serious to implicate the Cruel and Unusual Punishment

Clause. The subjective component is met if a prison official knows of and disregards an excessive risk to inmate health or safety.

Kikumura v. Osagie, 461 F.3d 1269, 1291 (10th Cir. 2006) (quotations and citations omitted).

Sheriff Hauf and Mr. Lane concede that the risk of, or potential for, suicide involves a sufficiently serious medical need and/or harm such that the objective prong of the Eighth Amendment is met. The issue in this case is, accordingly, the subjective prong. The subjective component requires that the defendant in question "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994); Mata v. Saiz, 427 F.3d 745, 751 (10th Cir. 2005). The official need not be aware "of a substantial risk to a *particular* inmate, or [have] knowledge of the particular manner in which the injury might occur." Tafoya v. Salazar, 516 F.3d 912, 916 (10th Cir. 2008). Furthermore, "a jury is permitted to infer that a prison official had actual knowledge of the constitutionally infirm condition based solely on circumstantial evidence, such as the obviousness of the condition." Id. "A prison medical professional who serves 'solely . . . as a gatekeeper for other medical personnel capable of treating the condition' may be held liable under the deliberate indifference standard if she 'delays or refuses to fulfill that gatekeeper role.'"

Mata, 427 F.3d at 751 (quoting Sealock v. Colorado, 218 F.3d 1205, 1211 (10th Cir. 2000)).

Sheriff Hauf and Mr. Lane argue that they cannot be liable under the subjective component because neither one knew, or had reason to know, that Peter was suicidal. Plaintiffs respond that such knowledge could be inferred because inmate Kenneth Lane had told certain jail staff about Peter's suicidal condition, because Peter had tried to commit suicide before, and other inmates had succeeded in doing so, and/or because the risk of suicide by a person undergoing opiate withdrawal (like Peter was from his methadone use) is obvious.

The district court rejected this argument, stating as follows:

> Having examined the evidence presented in light of the standards for individual liability enunciated above, the court concludes that Hauf and Lane are entitled to judgment in their favor. In keeping with its duty to view the facts in the light most favorable to plaintiffs, the court assumes that Kenneth [Lane] told various members of the jail staff that Peter was suicidal. Plaintiffs, however, have submitted no evidence that this information was ever transmitted to Hauf or Lane. Indeed, both Hauf and Lane testified they had no actual knowledge that Peter was suicidal, and plaintiffs have presented nothing other than the conjecture that this issue might have been raised at meetings Lane attended. . . .

Order at 11-12. The court further determined that

> [t]he only connection between Hauf and Lane and the constitutional violation is the supersession of the policies in effect prior to May 2010. There is, however, no evidence that Peter's suicide would have been avoided if the prior policies had been in effect. The prior substance abuse policy provided that medical staff would determine housing requirements for an inmate going through withdrawal, and that is what occurred in this case. Williams authorized Peter's

placement in the general population after she saw him on July 14, 2010. Whether this was the correct placement for Peter given what transpired can be argued, but it cannot [be] disputed that medical staff made the determination to remove him from the detox cell. Likewise, the prior policy on suicide prevention required jail staff to notify a shift supervisor if an inmate was suicidal; the shift supervisor, in turn, would notify medical. According to [inmate] Kenneth [Lane]'s testimony, each time he told a staff member that Peter was suicidal, the response was that medical would be notified. This response is in keeping with the prior policy. Finally, the court concludes plaintiffs have not presented sufficient evidence to create a triable issue as to whether the risk of suicide due to opiate withdrawal was so obvious that a jury could infer that Hauf and Lane were aware of that risk and were deliberately indifferent when they decided to abandon the prior policies. While the record reflects that three other suicide attempts were made at the Detention Center in 2009, there is no evidence they were related to drug or alcohol withdrawal. Plaintiffs, therefore, have not established a basis for supervisory liability under § 1983, and Hauf and Lane are entitled to judgment in their favor with respect to plaintiffs' claims against them in their individual capacities.

Id. at 12-14. After our own thorough review of the record in this case, and

viewing it in the light most favorable to plaintiffs, we agree with the district court

that Sheriff Hauf and Mr. Lane are entitled to judgment in their favor.[3]

---

[3]Plaintiffs rely heavily on a recent unpublished decision from our court, Layton v. Board of County Comm'rs, 512 Fed. Appx. 861 (10th Cir. 2013) (unpublished), in which we reversed the grant of summary judgment to the defendant Sheriff and County. In Layton, the decedent/detainee suffered from pre-existing medical conditions, "including congestive heart failure, diabetes, and hypertension. He had a pacemaker, and part of his treatment regimen included taking the medication Digoxin[, which] is filtered through the kidneys." Id. at 863. He ultimately died of, *inter alia*, kidney failure after the defendant Correctional Center and Sheriff did nothing despite receiving medical test results indicating that the detainee was suffering from acute kidney failure.

As indicated, we reversed summary judgment in favor of the Sheriff and County, concluding that "Appellants have raised a triable issue of material fact

(continued...)

Plaintiffs argue that it can be "inferred" that Mr. Lane (and therefore Sheriff Hauf as well) was aware of Peter's alleged suicidal thoughts and threats because the record shows that "Peter and other inmates complained to PCJ staff specifically about Peter's threats of suicide" and "those types of complaints were typically shared with Lane at daily shift meetings." Appellant's Op. Br. at 29. Plaintiffs primarily rely upon the testimony of inmate Kenneth Lane. Inmate Lane stated in his deposition that, prior to Peter's death, Peter had talked about suicide, and Lane had relayed that fact to "an older gentleman . . . probably in his 70s", a man named John, a sergeant named Justin, Lieutenant Nick Myers and a "[b]ig Indian kid." Dep. of Kenneth Lane at 30-38, Appellant's App. Vol. 5 at 1550-1558. Inmate Lane did not testify as to ever relaying concerns about Peter to Sheriff Hauf or Mr. Lane or any other jail staff other than those just listed. And there was no evidence that such information was relayed by jail staff to

---

[3](...continued)
regarding whether Sheriff Whetsel was aware of dangerous prison conditions that were likely to result in constitutionally deficient medical care for seriously ill detainees." Id. at 870. The district court below distinguished Layton on the ground that, as part of the evidence showing what the Sheriff knew at the time of the inmate's death, the appellants had "submitted evidence that tends to demonstrate longstanding, systemic deficiencies in the medical care that the jail provided to detainees–specifically, that the detainees were not being seen for medical care in a timely manner, that medications were not being administered as directed, that follow-up care was not being provided to seriously ill detainees, and that the jail's design prevented effective monitoring and supervision of detainees with serious medical needs." Id. at 869-70. We agree with the district court that the evidence under review at summary judgment was different in Layton than in this case. Significantly, there was no such evidence of "longstanding, systemic deficiencies in the medical care" provided to detainees.

Sheriff Hauf or Mr. Lane. The evidence, accordingly, does not support the conclusion that Sheriff Hauf and Mr. Lane knew, or should have known, of Peter's condition.

In short, our own review of the record supports the district court's conclusion that there was no evidence that either Sheriff Hauf or Mr. Lane, in their individual capacities, violated Peter's constitutional rights. They were therefore entitled to summary judgment on that claim.

## III.    Did Defendants' Policies and Practices Lead Directly to Peter's Death?

Plaintiffs next argue that defendants' policies and practices, or the lack of such policies and practices, caused Peter's suicide.[4]  "A municipality may not be held liable under § 1983 solely because its employees inflicted injury on the plaintiffs." Bryson v. City of Okla. City, 627 F.3d 784, 788 (10th Cir. 2010) (quoting Hinton v. City of Elwood, 997 F.2d 774, 782 (10th Cir. 1983)).  It may only be held liable under § 1983 "for its own unconstitutional or illegal policies." Barney v. Pulsipher, 143 F.3d 1299, 1307 (10th Cir. 1998).  A plaintiff must therefore "identify 'a government's policy or custom' that caused the injury." Schneider v. City of Grand Junction Police Dep't, 717 F.3d 760, 769 (10th Cir. 2013) (quoting Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691-92 (1978)).

---

[4]Sheriff Hauf and Mr. Lane were sued in both their individual and official capacities.  Official capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 690 n.55 (1978).

The plaintiff must then show "that the policy was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury." Id.

As the district court noted, deliberate indifference in the municipal liability context is an objective standard that

> may be satisfied "when the municipality has actual or constructive notice that its action or failure is substantially certain to result in a constitutional violation, and it consciously and deliberately chooses to disregard the risk of harm." Although a single incident generally will not give rise to liability, "deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a 'highly predictable' or 'plainly obvious' consequence of a municipality's action." The official position must operate as the "moving force" behind the violation, and the plaintiff must demonstrate a "direct causal link" between the action and the right violation. That is, "[w]ould the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect?"

Olsen v. Layton Hills Mall, 312 F.3d 1304, 1318 (10th Cir. 2002) (citations omitted). We agree with the district court and the defendants that there is simply no evidence that any policy or custom of PCJ was the moving force behind, or caused or enabled, Peter's suicide. Rather, the Jail had policies and practices in place to provide adequate medical care for all inmates. Those policies were followed in Peter's case. Furthermore, the contract with ACH was intended to provide medical care on-site with trained and qualified medical personnel. At the time Peter was booked into the Jail, pursuant to Jail policy and practice, the booking officer filled out a medical questionnaire and conducted a visual inspection of Peter. Among the questions asked, in accordance with policy, was

-16-

whether he had ever attempted suicide or whether he was currently thinking about it.  Peter answered in the negative.  Peter was then evaluated by trained medical staff, Dr. Olson and Nurse Williams.  There is no evidence that those individuals did anything other than properly perform their evaluations.

In short, having reviewed the record, and construing it in the light most favorable to the plaintiffs, we agree with the district court that summary judgment in favor of the County Board, and the individual defendants in their official capacities, was warranted.[5]

**IV.  Were Sheriff Hauf and Mr. Lane Entitled to Qualified Immunity?**

The district court did not address the issue of qualified immunity in its grant of summary judgment to defendants.  "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established . . . constitutional rights of which a reasonable officer would have known."  Pearson v. Callahan, 555 U.S. 223, 231 (2009); Lynch v. Barrett, 703 F.3d 1153, 1158 (10th Cir.  2013).  "Whether a

---

[5]Plaintiffs rely, in part, for their arguments in favor of liability for the defendants, on an investigation by the Oklahoma State Department of Health, conducted after Peter's death.  The investigation resulted in a report which identified some failures by the PCJ in its provision of medical care to inmates. The investigation did not reveal failures at a policy level, and it does not provide insight into what Sheriff Hauf and Mr. Lane knew at the time of Peter's death, inasmuch as it was performed after his death.  We accordingly agree with the district court and defendants that it does not undermine the district court's conclusions.

-17-

defendant is entitled to qualified immunity is a two-step process." Graves v. Thomas, 450 F.3d 1215, 1218 (10th Cir. 2006). First, we determine whether the plaintiffs have "asserted a violation of a constitutional right at all." Id. (quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)). If so, "we decide whether that right was clearly established such that a reasonable person in the defendant's position would have known that [his] conduct violated that right." Id. (further quotation omitted). We need not, however, even "reach the question of whether the individual defendants are entitled to qualified immunity if we determine, after a de novo review, that plaintiffs failed to sufficiently allege the violation of a constitutional right." Id. (further quotation omitted).

We have concluded, above, that the district court correctly found that the individual defendants, Sheriff Hauf and Mr. Lane, did not violate any constitutional right in connection with Peter's death. We therefore need not address the issue of qualified immunity.

**V.  Is the Board a Proper Party to the Section 1983 Claims?**

Finally, the plaintiffs challenge the district court's conclusion that the Board is not a proper party to this action. We agree with the district court's analysis on this point and affirm its decision for substantially the reasons it stated in its Order. In any event, plaintiffs have conceded that "if Plaintiffs can show an unconstitutional policy or custom in play in this matter, then the Board of County

-18-

Commissioners can also be held liable, and the trial court should be reversed in granting summary judgment for the County." Appellant's Op. Br. at 54-55. We have upheld the district court's determination that no such unconstitutional policy or custom is "in play" in this case; accordingly, by the plaintiffs' own admission, the Board is not a proper party to this case.

## CONCLUSION

For the foregoing reasons, we AFFIRM the district court's orders in this case.

ENTERED FOR THE COURT

Stephen H. Anderson
Circuit Judge