**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**November 29, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

THE ESTATE OF JOSEPH C. "TREY"
DUKE III, by and through its personal
representative Beth Anne Duke and Joseph
Councell Duke, Jr.; BETH ANNE DUKE;
JOSEPH COUNCELL DUKE, JR.,

     Plaintiffs - Appellants,

v.

GUNNISON COUNTY SHERIFF'S
OFFICE; RICHARD BESECKER, in his
individual capacity; IAN CLARK, in his
individual capacity; PAULA MARTINEZ,
in her individual capacity; CONNER
UDELL, in his individual capacity;
MEGAN HOLLENBECK, in her
individual capacity; CHAD ROBERTS, in
his individual capacity; BRANDON RUPP,
in his individual capacity; RYAN
PHILLIPS, in his individual capacity,

     Defendants - Appellees.

No. 18-1076
(D.C. No. 1:16-CV-01593-RBJ)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **TYMKOVICH**, Chief Judge, **EBEL** and **LUCERO**, Circuit Judges.
_____

Following Joseph Duke's untimely death while in the custody of the Gunnison

County Sheriff's Office ("GCSO"), Duke's parents and his estate filed suit against

_____

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

GCSO and several of its employees. We agree with the district court that the individual defendants are entitled to qualified immunity and that there is no basis to hold GCSO liable. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I

On June 27, 2015, GCSO Deputy Ian Clark found Duke outside a cabinet store in Gunnison, Colorado. Having been asked several times whether he was okay, Duke eventually responded that he was waiting for a girlfriend. Clark recognized Duke, and noted that his pupils were pinpointed, his eyes were glassy, and he seemed disoriented. After learning that Duke was subject to a protective order prohibiting the use of drugs or alcohol, Clark conducted a roadside sobriety test. Duke was unable to focus on Clark's finger, nodded his head several times, and was unsteady on his feet. Clark took Duke into custody for suspicion of using a controlled substance. While patting him down, Clark discovered a pill bottle containing packets of an unknown substance that later tested positive for heroin.

Clark was assisted by GCSO Deputy Paula Martinez, who transported Duke to the Gunnison County Detention Center in her patrol car. Duke appeared intoxicated but was able to sustain a lucid conversation. During lulls in the conversation, Duke seemed to be sleeping. He claimed to be using only a prescription medication. When she arrived at the jail at approximately 3:45 p.m., Martinez had Duke sit on a bench in a waiting area, where she was met by Clark, GCSO Deputy Scott Leon, Colorado State Trooper Zachary Trafton, and Corporal Jason Sparks. Duke entered the room under his own power and stood unaided while Martinez removed his handcuffs.

2

GCSO Deputy Ryan Phillips was working in the jail's control room at that time and observed Duke by video for approximately fifteen minutes.

Trafton and Sparks conducted a drug recognition exam ("DRE") to determine if Duke was under the influence of narcotics. Duke told them he had taken only Clonazepam as prescribed and directed, and claimed to be "91 days clean." However, he swayed while walking and standing, could not consistently touch his nose with his fingertip, and showed little pupil reaction to light. His pulse, blood pressure, and temperature were elevated. Trafton opined that Duke was under the influence of a stimulant and a narcotic. Duke refused a blood test. Clark observed the DRE and noted that Duke was able to engage in conversation and appropriately answer questions. After the exam was completed, Duke fell off a bench, but sat back on the bench without assistance.

Following the DRE, GCSO Deputy Conner Udell booked Duke into the jail. Duke's custody report indicated he had been found passed out, performed poorly on roadside tests, was under the influence of drugs, and was charged with possessing heroin. Udell placed Duke on a sixteen-hour drug hold. Inmates on a drug hold are monitored for signs of a drug overdose. The hold policy stems from an administrative order issued by a state district court prohibiting the release of individuals taken into custody until either sixteen hours have elapsed or the individual is no longer visibly intoxicated, whichever period is longer.

Udell assigned Duke to the padded cell H-5 because he was aware Duke had fallen. Cell H-5 also had an interior camera, through which GCSO Deputy Megan

3

Hollenbeck monitored Duke. Duke was agitated when he entered the cell, but he calmed down and slept for approximately two hours. At one point, Hollenbeck sent Udell to check if Duke was breathing. After waking up and leaving the cell under his own power with Udell, Duke returned and slept for another two-and-a-half hours.

GCSO Deputy Chad Roberts replaced Hollenbeck at 10:00 p.m. About forty minutes later, Duke asked to use the bathroom and the phone. Duke made two phone calls, and Udell sent him to cell H-2, which had a bathroom but no camera. From that time until 2:00 a.m., when Udell's shift ended, Udell observed Duke sleeping in his cell. GCSO Deputy Brandon Rupp replaced Udell. Rupp noticed that Duke was sitting upright and cross-legged, and thought it was an unusual way to sleep. He accordingly knocked on the window to ask Duke if he was alright. Duke responded in the affirmative. Rupp, Roberts, and Phillips checked on Duke several times throughout the night. However, Duke's time sheet includes several checks from deputies that are not reflected on surveillance videos.

At 7:30 a.m., Roberts delivered a breakfast tray to Duke. Duke took the tray and said thank you. When Roberts returned to the cell at approximately 8:00 to retrieve the tray, he noticed Duke was sitting cross-legged and bent over at the waist, and asked if Duke was okay. Duke said yes, and responded that he was still eating. At approximately 8:30, Phillips retrieved Duke's tray from a pass-through slot. He saw Duke sitting cross-legged with his forehead resting on a blanket in front of him, and observed that he was breathing. Phillips had seen Duke sitting like that before. Another inmate, Brandon Morse, saw Duke sitting in that position and said to Phillips

4

that Duke did not look so good. Phillips responded, "That's what you get for doing drugs." When Phillips exited the jail at the end of his shift just after 9:00, he saw Duke in the same position.

Five to ten minutes later, Rupp noticed that Duke had fallen forward and had vomit coming out of his mouth. He called for medical assistance and began lifesaving measures. Duke could not be resuscitated. An autopsy revealed a ruptured plastic baggie in Duke's stomach, and a high level of fentanyl in his gastric contents. A toxicology report showed the presence of fentanyl, cocaine, benzodiazepines, and oxycodone. A forensic toxicologist stated the drugs other than fentanyl did not play a significant role in Duke's death, and that the level of fentanyl indicated Duke did not begin metabolizing the drug prior to his arrest. According to the forensic toxicologist, this evidence suggested that Duke had swallowed a plastic baggy containing a fentanyl patch, and that the baggie ruptured near the time of his death. An expert retained by Duke opined that Duke died of an opioid overdose "in the presence of benzodiazepine," and noted that "[b]enzodiazepines increase the life endangering effects of opioid overdose."

Plaintiffs, Duke's parents and his estate, filed suit against GCSO and several individuals involved in Duke's detention. The district court granted summary judgment in favor of defendants. It concluded that the individual defendants were entitled to qualified immunity and that GCSO was not deliberately indifferent. The court declined to exercise supplemental jurisdiction over plaintiffs' state wrongful death claim. Plaintiffs timely appealed.

5

## II

We review the grant of summary judgment de novo.  Hobbs ex rel. Hobbs v. Zenderman, 579 F.3d 1171, 1179 (10th Cir. 2009).  A party is entitled to summary judgment only if, viewing the evidence in the light most favorable to the non-moving party, the movant is entitled to judgment as a matter of law.  Id.

### A

To determine if the individual defendants are entitled to qualified immunity, we consider:  (1) whether defendants' conduct violated plaintiff's constitutional rights; and (2) whether the right at issue was clearly established.  Gomes v. Wood, 451 F.3d 1122, 1134 (10th Cir. 2006).  As did the district court, we elect to resolve this case on the second prong.  See Riggins v. Goodman, 572 F.3d 1101, 1107-08 (10th Cir. 2009).

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  Klen v. City of Loveland, 661 F.3d 498, 511 (10th Cir. 2011) (quotation omitted).  "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of the pre-existing law the unlawfulness must be apparent."  Mimics, Inc. v. Vill. of Angel Fire, 394 F.3d 836, 842 (10th Cir. 2005) (quotation omitted).  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the

6

situation." Cortez v. McCauley, 478 F.3d 1108, 1114 (10th Cir. 2007) (en banc) (quotation and ellipses omitted).

The Due Process Clause of the Fourteenth Amendment provides detainees "the same degree of protection against denial of medical care as that afforded to convicted inmates under the Eighth Amendment." Estate of Hocker ex rel. Hocker v. Walsh, 22 F.3d 995, 998 (10th Cir. 1994).[1] A prison official's "deliberate indifference" to an inmate's serious medical needs violates the Eighth Amendment. Estelle v. Gamble, 429 U.S. 97, 102 (1976). To prevail on a deliberate indifference claim, a plaintiff must show that a prison official "knows of and disregards an excessive risk to inmate health or safety." Farmer v. Brennan, 511 U.S. 825, 837 (1994). An official's "inadvertent failure to provide adequate medical care" does not qualify. Self v. Crum, 439 F.3d 1227, 1231 (10th Cir. 2006).

Our court has decided two key cases concerning the treatment of intoxicated detainees. In Garcia v. Salt Lake County, 768 F.2d 303 (10th Cir. 1985), we held that a jail policy under which "unconscious individuals who were suspected of being intoxicated were admitted to the jail" was unconstitutional. Id. at 306. The detainee in that case was taken to a hospital after being arrested for driving while intoxicated. Id. at 305-306. He escaped from the hospital, consumed an overdose of barbiturates, and was found passed out on the pavement nearby. Id. He was booked into the jail

---

[1] The parties agree on this standard. We accordingly do not consider whether it has been undermined by subsequent case law. See Perry v. Durborow, 892 F.3d 1116, 1122 n.1 (10th Cir. 2018) (noting that some circuits have altered their standard for pre-trial detainee claims following the Supreme Court's decision in Kingsley v. Hendrickson, 135 S. Ct. 2466 (2015)).

and later found dead. Id. at 308. We held that a jury verdict in plaintiff's favor was "supported by sufficient evidence of gross deficiencies and deliberate indifference in staffing and procedures to monitor persons admitted to the jail in an unconscious condition who are suspected of being intoxicated." Id. at 308.

But we have distinguished Garcia in cases involving detainees who are inebriated but conscious and responsive. In Martinez v. Beggs, 563 F.3d 1082 (10th Cir. 2009), a man was arrested after a neighbor reported he had consumed an entire bottle of whiskey, fallen, and appeared to have been knocked out. Id. at 1085. When arrested, he was unable to stand. Id. at 1086. He passed out in the patrol car. Id. And he was unable to walk in a straight line to his cell. Id. About three hours later, he was found dead. An expert testified that he died of a heart attack "compounded by a toxic blood alcohol level," and would have survived had he been taken to a hospital. Id. at 1087. We distinguished Garcia as follows:

> Although defendants in Garcia were aware that Garcia was unconscious for many hours, they took no action to attend to his obvious medical needs. By comparison, [the detainee in this case] was conscious, on his feet, argumentative, and cognizant that he was being arrested. [He] exhibited characteristics that are common to many intoxicated individuals.

Martinez, 563 F.3d at 1091 (quotation omitted).

Plaintiffs seek to distinguish Martinez by arguing the plaintiff in that case died as a result of medical issues other than intoxication. See id. at 1090 (noting that although officers knew he was intoxicated, there was "no evidence to show that anyone would have known that [the detainee] would face an imminent heart attack or

8

death"); see also Estate of Hocker, 22 F.3d at 1000 (reliance on Martinez inappropriate because prisoner was conscious and died of suicide rather than alcohol poisoning). But the heart attack in Martinez was "compounded by a toxic blood alcohol level." 563 F.3d at 1087.

Moreover, to defeat a qualified immunity defense "existing law must have placed the constitutionality of the officer's conduct beyond debate." D.C. v. Wesby, 138 S. Ct. 577, 589 (2018) (quotation omitted). Duke, like the detainee in Martinez, exhibited many common characteristics of intoxicated individuals but was responsive and functioning. We conclude it is at least reasonably debatable that Martinez rather than Garcia provides the controlling precedent, and thus affirm the grant of qualified immunity to the individual defendants.

**B**

Plaintiffs also argue that GCSO itself is liable for Duke's death. Municipalities are not generally liable for constitutional violations committed by public employees, but may be held responsible if a plaintiff's rights were violated by a municipal policy or custom. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690-91 (1978). To prevail on a municipal liability claim, a plaintiff must show: "(1) that a municipal employee committed a constitutional violation, and (2) that a municipal policy or custom was the moving force behind the constitutional deprivation." Myers v. Okla. Cty. Bd. of Cty. Comm'rs, 151 F.3d 1313, 1316 (10th Cir. 1998).

A "failure to adequately train or supervise employees" qualifies as a policy if "that failure results from deliberate indifference to the injuries that may be caused."

9

Bryson v. Oklahoma City, 627 F.3d 784, 788 (10th Cir. 2010) (quotation omitted). This standard is satisfied if a "municipality has actual or constructive notice that its action or failure is substantially certain to result in a constitutional violation, and it consciously and deliberately chooses to disregard the risk of harm." Olson v. Layton Hills Mall, 312 F.3d 1304, 1318 (10th Cir. 2002) (quotation omitted). "Although a single incident generally will not give rise to liability, deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action." Id. (quotations and citation omitted).

Plaintiffs contend that GCSO failed to adequately train its employees as to the management of detainees under the influence of drugs, and failed to adopt appropriate policies and procedures for their care. There is no allegation that GCSO had prior experience with detainees in a sixteen-hour hold suffering lethal overdoes. GCSO relied on individual deputies to exercise their judgment in determining whether intoxicated individuals required medical treatment based on the totality of the circumstances. Although the lack of a more detailed training program and specific written policies might be deemed negligent, we agree with the district court that GCSO was not on notice that its policies were "substantially certain" to result in constitutional violations. See Olson, 312 F.3d at 1318 (quotation omitted). We therefore agree with the district court that GCSO was entitled to summary judgment.

10

## III

**AFFIRMED**.

Entered for the Court


Carlos F. Lucero
Circuit Judge